**IN THE UNITED STATES DISTRICT
COURT FOR THE SOUTHERN DISTRICT
OF IOWA CENTRAL DIVISION**

| | |
|---|---|
| MONICA WOODS, as Administrator of the Estate of T.J., Deceased,<br><br>Plaintiff,<br><br>v.<br><br>City of Des Moines; Dana Wingert; Thomas Garcia; Noah Bollinger, Zachary Duitscher,<br><br>Defendants. | Case No. 4:23-cv-00520<br><br><br>MOTION TO DISMISS |

**COME NOW THE DEFENDANTS, AND IN SUPPORT OF THIS MOTION TO**

**DISMISS PURSUANT TO RULE OF FEDERAL PROCEDURE 12(b)(6), STATE:** The

operative alleged facts[1], to which we are bound on a Motion to Dismiss are as follows, from

paragraphs 16-30 of the complaint:

"On December 26, 2022, at approximately 12:27 A.M., T.J.'s stepfather Curtis Woods

made a call to the City of Des Moines emergency 911 number stating that T.J., a 16-year-old boy,

was outside Mr. Wood's apartment at 400 East McKinley Ave., in possession of a handgun and

had earlier pointed it at Mr. Woods. At approximately 12:30 A.M., multiple officers responded

to the call at the apartment complex located at 400 East McKenley Ave. Some of the responding

officers saw T.J. outside a building near that location, and then observed him enter one of the

apartments. Defendant Garcia and Defendant Bollinger ran into the apartment T.J. had entered with

their handguns drawn, pointed them at T.J. and shouted repeatedly at him to drop his handgun.

---

[1] The City does not concede these facts. They are and will be contested. However, for purposes of the motion to dismiss, the City is required to accept these allegations as true.

Defendant Duitscher then forcibly entered the apartment by breaking the glass on the sliding back door behind where T.J. was standing, and Officer Nicholas Howard followed him into the apartment. T.J. was startled by the glass breaking and moved towards the northeast corner of the living room of the apartment. The Defendants moved to within three to six feet of T.J., continuously shouting at him to drop the handgun, and shined lights on him from several directions while keeping their guns pointed at him. During the encounter, T.J. made rambling comments about his older brother dying recently, stated, "I wanna die," and pulled out his phone and appeared to look at it.

During the encounter, T.J. said he would put the gun down if the officers would turn off the lights they were shining on him, adding, "Just turn the lights off . . . I know you [pointing to Bollinger] . . . I can talk to you." While Defendant Bollinger began to engage T.J. in conversation, the other Defendants continued to shout and made demands of T.J. to drop his handgun. The Defendants were still in the living room of the apartment arranged around T.J. between three and six feet from him while he stood in a corner. Then, T.J. looked down at the phone he was holding in his left hand, began raising his right hand, which held the handgun, towards his own head. At all times while raising his hand, the barrel of the handgun was pointed to T.J.'s immediate left and not in the direction of any officer. At the point in which T.J.'s arm was parallel to the ground across his stomach, Defendant Duitscher fired two shots at T.J., causing him to double over, fall to the ground, and drop his handgun. Defendants Bollinger and Garcia immediately fired multiple additional shots at T.J. after Defendant Duitscher shot T.J., striking him as well. As a result of the acts of Defendants Duitscher, Bollinger and Garcia in shooting T.J., riddling his body with bullets which struck him in the face, head, neck, shoulder, chest, arm, back, thigh, and hand, he was killed. At the time Defendant Duitscher fired the shots that caused T.J. to fall to the ground, T.J. was not

looking at Duitscher, but was looking directly down at the phone he was holding in his left hand."

"Although T.J. moved his right hand in which he was holding the handgun around during the encounter, including pointing the handgun down toward the ground, holding it across his chest, and pointing it toward his own head, he never pointed the gun at any of the Defendants while simultaneously looking at any of them, nor did he have a finger on the trigger of his handgun."

"At the time Defendant Duitscher fired the shots that caused T.J. to fall to the ground, T.J. did not have a finger on the trigger of his handgun. At no time before or after Defendant Duitscher, Defendant Bollinger or Defendant Garcia fired the shots at T.J. did he attempt to fire his handgun at anyone in the room. At no time before Defendant Duitscher, Defendant Bollinger or Defendant Garcia fired the shots at T.J. did he make any statement that he intended to harm any other person, including any of the Defendants in the room."

## DISMISSAL STANDARDS

For Rule 12(b)(6) motions, a court accepts as true all well-pleaded factual allegations and then determines "whether they plausibly give rise to an entitlement to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). The court must draw reasonable inferences in plaintiff's favor. *Zink v. Lombardi*, 783 F.3d 1089, 1098 (8th Cir. 2015). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Sletten & Brettin Orthodontics v. Cont'l Cas. Co.*, 782 F.3d 931, 934 (8th Cir. 2015).

> Determining if well-pled factual allegations "plausibly give rise to an entitlement to relief" is a "context-specific" task requiring the court to "draw on its judicial experience and common sense." *Id*. at 679, 682. The factual content of the plaintiff's allegations must "allow[ ] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Park Irmat Drug Corp. v. Express Scripts Holding Co.*, 911 F.3d 505, 512 (8th Cir. 2018) (quoting *Iqbal*,

556 U.S. at 678). In determining the plausibility of a plaintiff's claim, *Iqbal* and *Twombly* instruct the Court to consider whether "obvious alternative explanations" exist for the allegedly unconstitutional conduct. *Iqbal*, 556 U.S. at 682; *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 567 (2007). The Court must then determine whether the plaintiff plausibly alleges a violation of the law. *Iqbal*, 556 U.S. at 679. The well-pled facts must establish more than a "mere possibility of misconduct." *Id.*

*Davis v. City of St. Louis, Mo.*, No. 4:22-CV-00902-SEP, 2023 WL 4684510, at \*2 (E.D. Mo.

July 21, 2023). "Although *factual* "plausibility" is typically the focus of a Rule

12(b)(6) motion to dismiss, federal courts may dismiss a claim that lacks a

cognizable *legal* theory." *Johnson v. King,* No. 4:19-CV-04111, 2020 WL 2873399, at \*4 (W.D.

Ark. May 14, 2020), report and recommendation adopted, No. 4:19-CV-4111, 2020 WL

2850391 (W.D. Ark. June 2, 2020), citing *Somers v. Apple, Inc.*, 729 F.3d 953, 959 (9th Cir.

2013); *Ball v. Famiglio*, 726 F.3d 448, 469 (3d Cir. 2013); *Commonwealth Prop. Advocates,*

*L.L.C. v. Mortg. Elec. Registration Sys., Inc.*, 680 F.3d 1194, 1202 (10th Cir.

2011); *accord Target Training Intern., Ltd. v. Lee*, 1 F. Supp. 3d 927, 937 (N.D. Iowa 2014).

In deciding a motion brought under Rule 12(b)(6), the court may consider certain materials outside the pleadings, including (a) "the materials that are 'necessarily embraced by the pleadings and exhibits attached to the complaint,' " *Whitney*, 700 F.3d at 1128 (quoting *Mattes v. ABC Plastics, Inc.*, 323 F.3d 695, 697 n.4 (8th Cir. 2003)), and (b) " 'materials that are part of the public record or do not contradict the complaint.' " *Miller v. Redwood Toxicology Lab., Inc.*, 688 F.3d 928, 931 (8th Cir. 2012) (quoting *Porous Media Corp. v. Pall Corp.*, 186 F.3d 1077, 1079 (8th Cir. 1999)). Thus, the court may "consider 'matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint whose authenticity is unquestioned;' without converting the motion into one for summary judgment." *Miller*, 688 F.3d at 931 n.3 (quoting 5B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1357 (3d ed. 2004)).

*Hopper v. City of Waterloo*, No. 22-CV-2031 CJW-KEM, 2023 WL 370608, at \*2 (N.D. Iowa

Jan. 6, 2023).

**ARGUMENT**

"Qualified immunity shields government officials from suit unless their conduct violated a clearly established constitutional or statutory right of which a reasonable person would have known." *Yowell v. Combs*, 89 F.3d 542, 544 (8th Cir. 1996). "What this means in practice is that 'whether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the "objective legal reasonableness" of the action, assessed in light of the legal rules that were "clearly established" at the time it was taken.'" *Wilson v. Layne*, 526 U.S. 603, 614 (1999) (quoting *Anderson v. Creighton*, 483 U.S. 635, 639 (1987)). The applicable standard in such cases is viewed from the totality of the circumstances and judged from the viewpoint of a reasonable officer -- irrespective of the officer's underlying intent or motivation. *McCoy v. City of Monticello*, 342 F.3d 842, 848 (8th Cir. 2003).

Qualified immunity is an immunity from suit rather than a mere defense to liability… it is effectively lost if a case is erroneously permitted to go to trial." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). As the Eighth Circuit has noted, "[t]he Supreme Court has generously construed qualified immunity to shield 'all but the plainly incompetent or those who knowingly violate the law.'" *Littrell v. Franklin*, 388 F.3d 578, 582 (8th Cir. 2004) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). "Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." *Littrell*, 388 F.3d at 582. To overcome qualified immunity inquiry, Woods must establish that the defendants were "intentional or reckless, thereby shocking the conscience." *Brockinton v. City of Sherwood, Ark.*, 503 F.3d 667, 672 (8th Cir. 2007) (citing *Wilson v. Lawrence County, Mo.*, 260 F.3d 946, 955-56 (8th Cir. 2001)). Mere negligence will not suffice. *Id.*

Courts use a two-part test when determining whether a lawsuit against an official may proceed under a qualified immunity assertion. First, the court must determine whether, "taken in the light most favorable to the party asserting the injury… the facts alleged show the officer's conduct violated a constitutional right." *Saucier v. Katz*, 533 U.S. 194, 201 (2001). Second, the court must determine whether the right in question was "clearly established." *Id*. For the right to be clearly established, "the contours of the right must be sufficiently clear that a reasonable official would understand that what he was doing violates that right." *Buckley v. Rogerson*, 133 F. 3d 1125, 1128 (8th Cir. 1998).

As a consequence, a plaintiff is required to point to closely analogous cases or show that the right is so clear that no one thought it worthwhile to litigate the issue. *Dunn v. City of Elgin*, 347 F.3d 641, 650 (8th Cir. 2003). "If either question is answered in the negative, the public official is entitled to qualified immunity." *Norris v. Engles*, 494 F.3d 634, 637 (8th Cir. 2007) (quoting *Vaughn v. Ruoff*, 253 F.3d 1124, 1128 (8th Cir. 2001)). Both of these questions are answered in the negative for the reasons set forth below.

I.    <u>There was not a constitutional violation because the officers were justified in their use of lethal force</u>.

"The use of deadly force is reasonable where an officer has probable cause to believe that a suspect poses a threat of serious physical harm to the officer or others." *Loch v. City of Litchfield*, 689 F.3d 961, 965 (8th Cir. 2012). "While 'mere possession of a firearm' is not enough, this Court has recognized that an individual pointing a firearm at another or otherwise moving a firearm in a "menacing action" generally gives officers probable cause to use deadly force." *Cole ex rel. Est. of Richards v. Hutchins*, 959 F.3d 1127, 1132 (8th Cir. 2020) (citing *Partridge v. City of Benton*, 929 F.3d 562, 566 (8th Cir. 2019))." "The reasonableness of

[an officer's] use of deadly force is judged from the perspective of a reasonable officer on the scene, and not from the unknowable intentions of the victim". *Hernandez v. Jarman*, 340 F.3d 617, 624 (8th Cir. 2003).

According to the complaint, T.J. had earlier pointed the gun at his step-father, causing his step-father to call 911 to ask for assistance. After officers entered the apartment, T.J. moved the gun in his hand multiple times: toward the ground, toward his head, and parallel to the ground across his chest. It is important to consider how the petition's alleged facts depict the physical scene. The complaint states that T.J. was in the corner of the living room and he was surrounded by officers, specifically, the officers were "arranged around him" and were three to six feet away from him. Then T.J. lifted the gun to be parallel to the ground across his torso. By virtue of that allegation, the plaintiffs admit that T.J. raised the gun while surrounded by law enforcement[2] who, as indicated in the petition, had asked and/or demanded multiple times that he put the gun down. Bollinger attempted to talk to T.J. and engage him in conversation, otherwise stated, to deescalate the situation. In response, T.J. indicated that he wanted to die.

Plaintiffs allege that T.J. never said he was going to shoot anyone, that he was looking at his phone when he lifted the gun to be parallel to the ground, and his finger wasn't on the trigger. None of these are required for an officer to use deadly force. "Officers may use deadly force when there is probable cause to believe that [a] suspect poses a threat of serious physical harm, either to the officers or to others." *Tennessee v. Garner*, 471 U.S. 1, 11 (1985). The Officers were not required to wait until a gun was pointed right at them before they fired their guns. "In dangerous situations where an officer has reasonable grounds to believe that there is an imminent

---

[2] It is difficult to imagine how an individual who is surrounded by officers arranged all around him draws the gun into a parallel-to-the-ground position and not be pointing the weapon at someone. Nevertheless, the City must concede for a Motion to Dismiss that those two allegations both happened.

threat of serious harm, the officer may be justified in using a firearm before a subject actually

points a weapon at the officer or others." *Yang v. City of Minneapolis*, 607 F. Supp. 3d 880, 891

(D. Minn. 2022), citing *Liggins v. Cohen*, 971 F.3d 798, 801 (8th Cir. 2020); *Sinclair v. City of*

*Des Moines, Iowa*, 268 F.3d 594, 596 (8th Cir. 2001) ("[N]o constitutional or statutory right

exists that would prohibit a police officer from using deadly force when faced with an apparently

loaded weapon."). If there was a fact issue related to where the gun was pointed, we might be in

a more difficult position. *Partridge v. City of Benton, Arkansas*, 70 F.4th 489 (8th Cir. 2023).

There is not. The entire incident is recorded on video. But even based on the petition's stated

facts, T.J. lifted the gun to his torso, parallel to the ground. By nature, that means the gun was

pointed away from him at torso level, with officers arranged all around him. It was not pointed at

his head or at the ground. It was pointed at any object that was torso-level in front of him. That is

an imminent threat to the officers and others. For all these reasons, the officers did not commit a

constitutional wrong in their use of lethal force under these circumstances.

II.     <u>It was not clearly established that an officer is constitutionally barred from using
        lethal force when an individual points a gun at torso level when surrounded by
        officers who are 3-4 feet away, just because he wasn't looking at them or had his
        finger poised on the trigger.</u>

If this court finds that there was a federal constitutional right violated, the inquiry moves

on the second prong of immunity analysis, regarding whether a right is clearly established. As

summarized by the Supreme Court,

> The doctrine of qualified immunity shields officials from civil liability so long as
> their conduct "'does not violate clearly established statutory or constitutional
> rights of which a reasonable person would have known.'" *Pearson v. Callahan,*
> 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800 (1982)). A
> clearly established right is one that is "sufficiently clear that every reasonable
> official would have understood that what he is doing violates that right." *Reichle
> v. Howards,* 566 U.S. 658 (2012). "We do not require a case directly on point, but
> existing precedent must have placed the statutory or constitutional question

beyond debate." *Ashcroft v. al–Kidd,* 563 U.S. 731, 741 (2011). Put simply, qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs,* 475 U.S. 335, 341 (1986).

*Mullenix v. Luna*, 577 U.S. 7, 11 (2015).

> Clearly established law is "dictated by controlling authority or a robust consensus of cases of persuasive authority." *Id.* at 589–90 (internal quotation marks and citation omitted). "[P]recedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply." *Id.* at 590. "It is not enough that the rule is suggested by then-existent precedent." *Id.* The "clearly established" standard, therefore, requires that a particular rule's contours be well defined at a "high 'degree of specificity.' " *Id.* (citation omitted). Courts should not "define clearly established law at a high level of generality" but should "identify a case where an officer acting under similar circumstances ... was held to have violated the Fourth Amendment." *Id.* (citation omitted). The case need not be "directly on point," but should place the lawfulness of the officer's conduct "beyond debate." *Id.* (citation omitted).

*Lane v. Nading*, 927 F.3d 1018, 1022 (8th Cir. 2019), citing *D.C. v. Wesby*, 583 U.S. 48, 61 (2018).

There is no case law in the Eighth Circuit that states officers may not use lethal force in a situation where T.J. "never pointed the gun at any of the Defendants <u>while</u> simultaneously looking at any of them, nor did he have a finger on the trigger of his handgun." (Complaint, Paragraph 33). This statement is a concession that T.J. pointed the gun at the officers—he just did it without looking at the officers and had his finger off the trigger.

A search of Westlaw[3] produced one case in the Eighth Circuit that addressed the placement of a finger on a trigger, but it related to an allegation that an officer displayed force with his finger on the trigger of his service weapon. The search produced no cases from the Supreme Court of the United States. From other circuits, there is a collection of cases that are about police officers who had fingers on triggers. Then there is a disparate group of cases that

---

[3] Search terms: adv: finger /5 trigger & "lethal force" and adv: finger /5 trigger & "deadly force" produced no cases in the Eighth Circuit or from the Supreme Court of the United States.

address either a suspect who had a finger on the trigger or who the officer couldn't tell if there

was a finger on the trigger. One example is as follows:

> The appellants point to evidence that the officers did not see Martinez disable the
> safety of his gun, chamber a round, or put his finger on the trigger of the gun.
> However, this evidence does not raise a dispute as to a genuine issue of material
> fact. Monico testified that even though he did not see Martinez disable the safety
> of his gun, he assumed that Martinez had readied the weapon for use when he was
> in his vehicle. This assumption was not only reasonable, it was appropriately
> prudent to view the gun as being ready for firing with a chambered round.
> Whether Martinez's finger was on the trigger is irrelevant. Even if Martinez's
> finger was not on the trigger, it would only take a fraction of a second for him to
> place it there.

*Est. of Martinez v. City of Fed. Way*, 105 F. App'x 897, 898 (9th Cir. 2004). In another factually

similar case, the Fifth Circuit determined:

> Santiago Martinez arrived first on the scene and observed Garza holding a black
> handgun. Martinez drew his service weapon, slowly advanced toward Garza, and
> repeatedly ordered him to drop the gun. Garza did not do so and instead continued
> to move the firearm around in different directions while making facial gestures at
> Martinez. At that time, Garza did not have his finger on the trigger and was not
> pointing the gun at anyone. Martinez took cover, readied his rifle, and radioed the
> other responding officers to advise them of the situation… At 1:50 a.m., Garza
> raised his weapon and pointed it in Santiago Martinez's direction. Martinez yelled
> at Garza to stop, but he did not do so. Martinez fired his weapon at Garza. The
> other defendants, fearing that Garza was shooting at Martinez, also fired. They
> continued to fire until Garza fell to the ground and stopped moving. The shooting
> lasted about eight seconds. Each defendant fired at least one shot, and sixty-one
> shots were fired in total. Eighteen shots struck Garza, who died from his wounds.
>
> A reasonable officer in any of the defendants' shoes would have believed that
> Garza posed a serious threat regardless of the direction that Garza was pointing
> his gun just before he was shot.

*Garza v. Briones*, 943 F.3d 740, 743 (5th Cir. 2019). The most robust statement on this issue is

that there is no requirement that a person has a finger on a trigger for deadly force to be used.

Conversely, there is not a robust body of caselaw, from any circuit, that indicates, in order to use

deadly force, a suspect's finger must be on a trigger and that person must be looking at an officer,

while pointing a gun at them. Absent that, this case must fail, even on the facts as stated in the

complaint. For the reasons stated above, the Defendants respectfully request dismissal under Federal Rule of Civil Procedure 12(b)(6).

Respectfully Submitted,

*/s/ Michelle Mackel-Wiederanders*
Michelle Mackel-Wiederanders
Assistant City Attorney
400 Robert D. Ray Drive
Des Moines, IA 50309-1891
Email: mrmackel@dmgov.org
Telephone: (515) 283-4537

/s/ *Luke DeSmet*
Luke DeSmet
Assistant City Attorney
400 Robert D. Ray Dr.
Des Moines, Iowa 50309-1891
Telephone: (515) 283-4110
Email: lmdesmet@dmgov.org

ATTORNEYS FOR DEFENDANTS