**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION**

| | |
|---|---|
| MONICA WOODS, as Special Administrator of the Estate of T.J., Deceased )<br>    Plaintiff, )<br>)<br>vs. )<br>)<br>CITY OF DES MOINES, DANA WINGERT, )<br>THOMAS GARCIA, and NOAH BOLLINGER )<br>    Defendants. ) | Case No. 4:23-cv-00520<br><br>**PLAINTIFF'S RESISTANCE TO DEFENDANTS' AMENDED MOTION TO DISMISS** |

NOW COMES the Plaintiff Monica Woods, as Special Administrator of the Estate of T.J., Deceased, and in resistance to the Defendants' Motion to Dismiss pursuant to F.R.C. P. 12(b)(6) states:

**INTRODUCTION**

This case arises from the fatal shooting of T.J. in December 2022 by police officers of the City of Des Moines ("City"). Plaintiff Monica Woods, individually and as administrator of T.J.'s estate, brings several constitutional and common law claims seeking damages for T.J.'s wrongful death against the City, the police chief, and individual officers. In Counts I through III, Woods asserts claims against Defendants Thomas Garcia, Noah Bollinger, and Zachary Duitscher arising under the Fourth Amendment of the United States Constitution for excessive use of deadly force. (R. Doc. 30 ¶¶ 57-86). Counts IV and V alleges *Bivens* claims against the City and its police chief, Dana Wingert, for the failure to establish, maintain, or enforce policies, patterns, practices, or customs for the use of deadly force. (R. Doc. 30 ¶¶ 87-102). Counts VI through X alleged common law claims against the City and officers for wrong death. (R. Doc. 30 at ¶¶ 103-134). Following service of process, Defendants filed a motion to dismiss the constitutional claims, asserting they are entitled to qualified immunity. (R. Doc. 10). Following

1

Plaintiff's amended Complaint, Defendants filed an amended motion to dismiss. (R. Doc. 32).

## LEGAL STANDARD

The Federal Rules of Civil Procedure require a complaint to present "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Conversely, a complaint is subject to dismissal when it "fail[s] to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To meet this standard, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. Although the plausibility standard "is not akin to a 'probability requirement,'" it demands "more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). All reasonable inferences must be drawn in the plaintiff's favor, *Crooks v. Lynch*, 557 F.3d 846, 848 (8th Cir. 2009), but "[t]he facts alleged in the complaint 'must be enough to raise a right to relief above the speculative level,'" *Clemons v. Crawford*, 585 F.3d 1119, 1124 (8th Cir. 2009) (quoting *Drobnak v. Andersen Corp.*, 561 F.3d 778, 783 (8th Cir. 2009)).

## ARGUMENT

### I. DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY AS A MATTER OF LAW

#### A. Applicable legal principles

Defendants' Rule 12(b)(6) motion rests solely on the claim that they are entitled to qualified immunity. The doctrine of qualified immunity protects public officials from personal liability under 41 U.S.C. section 1983 "insofar as their conduct does not violate clearly established

statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). It is an "affirmative defense" and "will be upheld on a 12(b)(6) motion only when the immunity is established on the face of the complaint." *Hafley v. Lohman*, 90 F.3d 264, 266 (8th Cir. 1996) (citing *Weaver v. Clarke*, 45 F.3d 1253, 1255 (8th Cir. 1995)). Qualified immunity requires a two-step analysis. First, the Court must determine whether plaintiff has alleged the violation of a constitutional right. *Williams v. City of Burlington*, 27 F.4th 1346, 1350 (8th Cir. 2022). Second, it must determine whether the right was "clearly established" at the time of the violation. *Id.* The Court may analyze either step first. *Pearson*, 555 U.S. at 236.

> **B.     At the time he was shot and killed, T.J. had a clearly established right under the Fourth Amendment to be free from the excessive use of deadly force**

The estate's constitutional claims are anchored in the Fourth Amendment, which provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV. An objectively unreasonable use of force is excessive and violates the Fourth Amendment's prohibition against unreasonable seizures. *Graham v. Connor*, 490 U.S. 386, 394-96 (1989). "Excessive force claims are necessarily fact-intensive." *Deville v. Marcantel*, 567 F.3d 156, 167 (5th Cir. 2009). Whether the force is excessive or unreasonable depends on the "the facts and circumstances of each particular case." *Graham*, 490 U.S. at 396.

Counsel for Defendant officers suggests that dismissal is appropriate on qualified immunity grounds because they "could not locate case law in the Eighth Circuit that states officers may not use lethal force in a situation where a suspect moved a gun around, yet 'never pointed the gun at any of the Defendants, nor did he have a finger on the trigger of his handgun.'" (R. Doc. 32 at 8). The qualified immunity doctrine is not nearly so cramped as they suggest. *Estate of Smart v. City*

3

*of Wichita*, 951 F.3d 1161, 1168 (10th Cir. 2020) ([O]ur analysis is not a scavenger hunt for prior cases with precisely the same facts, and a prior case need not be exactly parallel to the conduct here for officials to have been on notice of clearly established law"). "For a constitutional right to be clearly established, there does not have to be a previous case with exactly the same factual issues." *Burlington*, 27 F.4th at 1352; *see also Hope v. Pelzer*, 536 U.S. 730, 741 (2002) ("officials can still be on notice that their conduct violates established law even in novel factual circumstances"). Indeed, the Eighth Circuit takes a "broad view of what constitutes clearly established law" and permits courts to consider "all available decisional law, including decisions of state courts, other circuits, and district courts." *K.W.P. v. Kan. City Pub. Sch.*, 931 F.3d 813, 828 (8th Cir. 2019). Ultimately, the question is "whether prior cases would have put a reasonable officer on notice that the use of deadly force in these circumstances would violate the right not to be seized by the use of excessive force." *Burlington*, 27 F.4th at 1352.

Viewing the qualified immunity doctrine with the proper lens, several relevant points of law were clearly established in the Eighth Circuit at the time of T.J.'s death. First, the use of deadly force is not objectively reasonable unless an officer has probable cause to believe a suspect "poses an *immediate* threat of death or serious bodily harm to others." *Cole v. Hutchins*, 959 F.3d 1127, 1132 (8th Cir. 2020) (emphasis added) (citing *Tennessee v. Garner*, 471 U.S. 1, 9 (1985)). Second "it [is] clearly established that a person does not pose an immediate threat of serious physical harm to another when, although the person is in possession of a gun, he does not point it at another or wield it in an otherwise menacing fashion."[1] *Id.* at 1132, 1134 (citing *Partridge v.*

---

[1] In particular, "it was clearly established that an individual does not pose an immediate threat of serious physical harm to others when, although that person is seemingly in possession of a gun, he does not raise it toward another or otherwise appear 'ready to shoot' in the moment." *Cole*, 959 F.3d at 1134 (citing *Nance v. Sammis*, 586 F.3d 604, 611 (8th Cir. 2009)). "A robust consensus of cases of persuasive authority confirms [the] principle evident in *Nance* – that a person in possession of a firearm is not an immediate threat unless he appears ready to shoot." *Id.* at

*City of Benton*, 929 F.3d 562, 566 (8th Cir. 2019); *Craighead v. Lee*, 299 F.3d 954, 961 (8th Cir. 2004)). Third, "it [is] clearly established that a few seconds is enough time to determine an immediate threat has passed, extinguishing a preexisting justification for the use of deadly force." *Id.* at 1135-36 (citing *Waterman v. Batton*, 393 F.3d 471, 481 (4th Cir. 2005) ("[Deadly] force justified at the beginning of an encounter is not justified even seconds later if the justification for the initial force has been eliminated"); *Abraham v. Raso*, 183 F.3d 279, 294 (3d Cir. 1999) ("A passing risk . . . is not an ongoing license to kill an otherwise unthreatening suspect"); *Ellis v. Wynalda*, 999 F.3d 243, 247 (7th Cir. 1993) ("When an officer faces a situation in which he could justifiably shoot, he does not retain the right to shoot at any time thereafter with impunity").

    **C.**    **The Defendant officers' use of deadly force was objectively unreasonable based on the facts alleged in the amended Complaint**

The case law is clear that "officers may not use deadly force against suicidal people unless they threaten harm to others, including the officers." *Weinmann v. McClone*, 787 F.3d 444, 450 (7th Cir. 2015) (citing cases); *see also Estate of DiPiazza v. City of Madison*, 2017 U.S. Dist. LEXIS 54955 *32 (W.D. Wis. April 11, 2017) ("the law was clearly established as early as 2007 that officers may not use deadly force against suicidal people unless they threaten harm to others, including the officers"). As applied to this case, T.J. had a clearly established constitutional right not to be shot-on-sight unless he posed a threat of serious physical harm to the officers or others. *Id.* at 448. Here, the officers on the scene knew that T.J. had retreated to the living room of an apartment and was not actively resisting. He never made any threats other than to himself. To the contrary, T.J. engaged the officers in a dialogue in which he stated that their lights "were triggers" and repeatedly asked them to turn them off. Approximately ninety-seconds after their initial contact, T.J. pointed to his gun and told the officers, "I'm gonna put this down." During the

---

1134-35 (citations and quotations omitted).

encounter, T.J. also informed the officers that his brother had just died, he wanted to die, and he wanted to be with his brother. These facts fall short of suggesting anything more than T.J. was placing himself in danger. *See id.* at 449.

At the moment the Defendant officers shot and killed T.J., the threat of serious physical harm – to the extent it ever existed – had passed. T.J. had been looking down at his cell phone for several seconds. Though T.J. raised the gun, his finger was not on the trigger. More importantly, the muzzle was pointed directly upward toward himself and not at anyone. Perhaps most telling, Officer Howard was standing closest to T.J.'s direct left and never fired his gun.

As alleged in the Estate's amended Complaint, the Defendant officers shot a non-resisting, non-fleeing minor as he moved his gun to point it upward and to his left, where no one was located, while looking down at his phone. These allegations are sufficient to state a claim that Defendant officers' use of deadly force was excessive in violation of the Fourth Amendment. *See O'Malley v. City of Flint*, 652 F.3d 662, 677 (6th Cir. 2011) ("Once a defendant's argument drifts from purely legal into the factual realm and begins contesting what really happened, our jurisdiction ends and the case should proceed to trial"). Under the circumstances alleged in the amended Complaint, no reasonable officer could conclude that T.J. posed an immediate threat of serious physical harm to others. And, because the law was clearly established that every reasonable officer would understand that shooting an individual in these circumstances was unlawful, Defendant officers are not entitled to qualified immunity.[2]

---

[2] The out-of-circuit cases cited by Defendant officers do not lead to a different conclusion. (R. Doc. 32 at 8-10); *see Grant v. Wilson*, 2022 U.S. App. LEXIS (6th Cir. Aug. 18, 2022) (decedent holding shotgun to his chin and finger on the trigger while "slowly shuffling" toward officer within four or five feet); *Garza v. Briones*, 943 F.3d 740 (5th Cir. 2019) (decedent raised the gun, pointed the barrel in the officer's direction, and "lowered his eyeline seeming to aim the firearm"); *Thornton v. City of Columbus*, 727 Fed. Appx. 829 (6th Cir. 2018) (decedent "was looking right at [officers], ignored their commands, did not drop the shotgun, and instead continued walk towards the Officers"); *Thomson v. Salt Lake City*, 584 F.3d 1304, 1318-19 (10th

## II.  DEFENDANTS' ASSERTION OF QUALIFIED IMMUNITY RESTS ON A MISSTATEMENT OF FACTS AND IMPERMISSIBLE INFERENCES

In their amended motion, the Defendant officers concede that "mere possession of a firearm is not enough" to justify the use of deadly force. (R. Doc. 30 at 5). But, they contend that when an "individual [is] pointing a firearm at another or otherwise moving a firearm in a 'menacing action," they "generally" have probable cause to use deadly force. (R. Doc. 30 at 5). Even assuming that is a correct articulation of the law, the problem with this contention is that it is not supported by the amended Complaint. Just the opposition – the amended Complaint alleges T.J. was not pointing his gun at any of the officers at the time they shot him. (R. Doc. 30 at 7-8, ¶¶ 34, 35, 42). Specifically, the amended Complaint alleges "[w]hile looking at his phone, T.J. began raising his right arm, holding the handgun in his right hand with the muzzle pointed upward toward his head." (R. Doc. 30 at 7, ¶ 33). Along the same lines, there are no allegations in the amended Complaint from which a factfinder could infer that he was moving the firearm in a menacing action. Indeed, "for more than two minutes before he was shot," T.J. "kept the muzzle pointed directly down at the floor." (R. Doc. 30 at 8, ¶¶ 32, 33). The inference to which the Estate is entitled is that T.J. did not point the gun at anyone in the room, and that as he was in the process of raising it to his head, he angled the end of the barrel up toward his own head. (R. Doc. 30 at 7, ¶¶ 34-35). An additional fact supports this inference. Officer Howard – who would have been closest to the purported line of fire – never discharged his gun. (R. Doc. 30 at 7, ¶ 37).

There are no facts in the amended Complaint from which the Court may infer that when the shots were fired at T.J., the handgun he held was pointed at any of the Defendants rather than

---

Cir. 2009) (decedent repeatedly threated to shoot the officers and a few second prior to pointing his gun to his head the suspect had pointed his gun at the officers); *Estate of Martinez v. City of Federal Way*, 105 Fed. App. 897 (9th Cir. 2004) (decedent was intoxicated, belligerent and raising both arms in an "angel wings" fashion while still holding the gun).

angled upward toward his head in a direction where no one was located. Nor are there any facts that T.J. had a line of sight on any person as he raised the gun toward his head. *See Evans v. Krook*, 2023 U.S. Dist. LEXIS 115559 (D. Minn. July 6, 2023)("The mere fact Evans was holding a gun to his head was not enough to justify deadly force. Rather, Evans needed to point the firearm at another individual or take some menacing action"). Instead, his eyes focused down at the screen of his cell phone he held in his left hand. (R. Doc. 30 at 8, ¶ 40).

Defendants gratuitously include facts as to events that occurred at an earlier time and different place before the officers arrived, which did not occur in the room where T.J. was found and shot. (R. Doc. 32, at 5). But, the facts alleged in the amended Complaint are: "T.J.'s stepfather Curtis Woods made a call to the City of Des Moines emergency 911 number stating that T.J., a 16-year-old boy, was *outside* Mr. Wood's apartment . . . in possession of a handgun and had *earlier* pointed it at Mr. Woods." (R. Doc. 30 at 4, ¶16)(emphasis added). The amended Complaint further states that when the officers responded to the call, they observed T.J. go into the apartment where they followed, and where they eventually shot him. (R. Doc. 30 at 4, ¶18). T.J. did not point his gun at anyone other than himself at any time after the officers arrived. He had engaged in communication with Bollinger, then was looking down at the screen of his cell phone and was only threatening to shoot himself. (R. Doc. 30, at 7-8, ¶¶ 28, 30). When they made the decision to shoot T.J., the Defendant officers saw T.J. looking down at his cell phone in his left hand while raising the handgun in his right hand toward his own head. (R. Doc. 30 at 7, ¶ 40). T.J. did not fire the handgun at all before or after being shot by Defendant Duitscher. (R. Doc. 30 at 7, ¶ 39).

The inferences to which the Plaintiff, as nonmovant, are entitled from the facts in the complaint are:

- The 911 call by Mr. Woods was made in regard to conduct by T.J. that occurred at a time earlier than when any police officers arrived at the scene;

- The 911 call referenced conduct by T.J. had ceased and did not re-occur at any time the Defendants were present;

- The 911 call referenced conduct by T.J. that had occurred at another location, not inside the apartment where he was shot;

- T.J. was not pointing the gun at anyone in the room with him at the time he was shot;

- T.J. never pointed the gun at anyone in the room other than himself before the Defendants shot him multiple times;

- When he was shot, the officers could see that T.J. was in the process of moving his gun in his right hand toward his own head;

- When he was shot, the Defendant officers could see that T.J. was not looking toward anyone while holding the handgun, but was looking down at his cell phone in his left hand;

- T.J. was not waving the handgun around in the apartment in a menacing manner at any time before he was shot;

- T.J. made statements that he wanted to die in the seconds before he was shot;

- T.J. was not attempting to flee from the apartment when he was shot.

The facts alleged here do not satisfy the criteria in *Garner* that the deadly force must be necessary to prevent escape. *Garner*, 471 U.S. at 3. Likewise, the facts do not satisfy the criteria that the Defendant officers had probable cause to believe the T.J. posed a significant threat of death or serious physical injury to the officers or anyone other than himself. *Id.* Notwithstanding the Defendants' statement that they accept the operative facts in the Complaint as true for purposes of their motion, in their motion they improperly summarize those facts and claim inferences impermissibly favorable to them from the facts, as stated above. In this way, they present "evidence they'd like a jury to accept," rather than just the facts alleged in the estate's Complaint. *Vodak v. City of Chicago*, 639 F.3d 738, 740 (7th Cir. 2011). "Such a mode of presentation is

unhelpful to the court." *Id.*

## CONCLUSION

WHEREFORE, for the reasons stated above, the Plaintiff Monica Woods respectfully requests this Court deny the Defendants' Motion to Dismiss under Federal Rule of Civil Procedure 12(b)(6).

Respectfully submitted,

_____
Gary Dickey, AT#0001999
DICKEY, CAMPBELL, & SAHAG LAW FIRM, PLC
301 East Walnut, Suite 1
Des Moines, Iowa  50309
Tel: 515.288.5008  Fax: 515.288.5010
gary@iowajustice.com


/s/ Lawrence Hyman_____
Lawrence Hyman
LAWRENCE H. HYMAN & ASSOCIATES, LTD.
111 W. Washington Street, Suite 1025
Chicago, Illinois  60602
Tel: 312.346.6766  Fax: 312.346.9688
hymanlaw@lhyman.com
*pro hac vice*

*Attorneys for Plaintiffs*