IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | | |
|---|---|---|
| MONICA WOODS, as Administrator of the Estate of T.J., Deceased, | ) ) ) | Case No. 4:23-cv-00520-SMR-SBJ |
| Plaintiff, | ) ) ) | |
| v. | ) ) | ORDER ON MOTION TO DISMISS |
| CITY OF DES MOINES, DANA WINGERT, in his Official Capacity as Chief of Police for the City of Des Moines, Iowa, THOMAS GARCIA, Individually and in his Official Capacity as a Police Officer for the City of Des Moines, Iowa, NOAH BOLLINGER, Individually and in his Official Capacity as a Police Officer for the City of Des Moines, Iowa, and ZACHARY DUITSCHER, Individually and in his Official Capacity as a Police Officer for the City of Des Moines, Iowa, | ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

This case arises from the fatal shooting of a 16-year old boy by Des Moines police officers who responded to a call involving a potentially armed and suicidal teenager. The Court now confronts whether qualified immunity shields these officers from liability at the pleading stage. Although law enforcement must make difficult, split-second decisions in dangerous situations, the Constitution demands accountability when those decisions may have unnecessarily cost a young life. The allegations here present troubling questions that cannot be resolved on the pleadings alone. At this early stage, the Court must determine whether the officers' conduct, as alleged, violated clearly established constitutional rights. The Court finds, at this early stage, that the

officers' conduct, as alleged, violated clearly established constitutional rights and qualified immunity is not applicable.

## I.    BACKGROUND

On December 26, 2022, Des Moines police officers shot and killed T.J., a 16-year-old minor. Monica Woods, as Administrator of T.J.'s Estate, brings this action against the City of Des Moines ("City"), Police Chief Dana Wingert, and three police officers—Thomas Garcia, Noah Bollinger, and Zachary Duitscher—seeking damages for T.J.'s death. [ECF No. 30 ¶ 2].

The Amended Complaint alleges that T.J.'s stepfather, Curtis Woods, called 911 to report that T.J. was outside his apartment with a handgun and had earlier pointed it at him. *Id*. ¶ 16. When officers arrived, they saw T.J. enter an apartment, which they then entered with their handguns drawn. *Id*. ¶ 18–19. The officers had pointed their guns at T.J. and repeatedly commanded him to drop the weapon. *Id.* ¶ 19. Several other officers then made entry into the apartment and confronted T.J. in the living room, positioning themselves around him at a distance of three to six feet. *Id*. ¶ 23.

During the approximately four-minute encounter, T.J. informed the officers that his brother had recently died, and he stated multiple times that he wanted to die and "be with [his] brother." *Id*. ¶¶ 27, 30. After about ninety seconds, T.J. indicated he was "gonna put this [gun] down." *Id*. ¶ 24. Throughout encounter, T.J. kept the muzzle of his handgun pointed at the floor. He asked the officers to turn off their lights, stating "them flashlights are triggers." *Id*. ¶¶ 26, 41. Some officers complied with this request. *Id*. ¶ 31.

The Amended Complaint alleges that immediately before the shooting, T.J. had been looking at his cell phone in his left hand for at least seven seconds. *Id*. ¶ 40. While still focused on his phone, T.J. began raising his right arm, which held the handgun, with the muzzle pointed

upward toward his head. *Id.* ¶ 33. The Amended Complaint further alleges that "[a]t all times while raising his hand, the muzzle of the handgun was pointed to T.J.'s immediate left and not in the direction of any officer." *Id.* ¶ 34. When T.J.'s arm was "across his stomach and chest, with the muzzle of the gun still pointed toward his head," Defendant Duitscher fired two shots at T.J., causing him to fall to the ground and drop his handgun. *Id.* ¶ 35. Defendants Bollinger and Garcia then fired multiple additional shots, collectively striking T.J. fourteen times. *Id.* ¶¶ 36, 38. These events were captured on the officers' body cameras.

The Amended Complaint asserts ten counts: five federal civil rights claims under 42 U.S.C. § 1983 for excessive force and failure to establish or enforce proper policies and practices regarding the use of deadly force, and five state law claims for wrongful death. [ECF No. 30]. Defendants now move to dismiss the federal civil rights claims on qualified immunity grounds, contending that their use of deadly force was justified and that no clearly established law prohibited their actions under the circumstances. [ECF No. 32].

## II.    DISCUSSION

### A. *Legal Standard*

Federal Rule of Civil Procedure 8(a)(2) requires a complaint to present "a short and plain statement of the claim showing that the pleader is entitled to relief." A complaint is subject to dismissal when it "fail[s] to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). When evaluating a motion to dismiss, the Court accepts all well-pleaded factual allegations as true and draws all reasonable inferences in the plaintiff's favor. *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009).

To survive a motion to dismiss, a complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S.

662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is plausible when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*.  This standard "is not akin to a 'probability requirement,'" but demands "more than a sheer possibility that a defendant has acted unlawfully." *Id*.

Qualified immunity is an affirmative defense that shields government officials from civil liability unless their conduct violated "clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (citation omitted).  At the motion to dismiss stage, qualified immunity "will be upheld . . . only when the immunity is established on the face of the complaint." *Hafley v. Lohman*, 90 F.3d 264, 266 (8th Cir. 1996) (citation omitted).  The qualified immunity analysis has two steps: first, whether the plaintiff has alleged the violation of a constitutional right, and second, whether that right was "clearly established" at the time of the violation. *Williams v. City of Burlington*, 27 F.4th 1346, 1350 (8th Cir. 2022).

*B. Analysis*

1. Violation of a Constitutional Right

The Fourth Amendment safeguards individuals against "unreasonable searches and seizures."  U.S. Const. amend. IV.  The use of deadly force by a police officer constitutes a "seizure" subject to the Fourth Amendment's reasonableness requirement. *Tennessee v. Garner*, 471 U.S. 1, 7 (1985).  An objectively unreasonable use of force violates the Fourth Amendment. *Graham v. Connor*, 490 U.S. 386, 396–97 (1989).

Deadly force is constitutionally reasonable only when an officer has "probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer

or others." *Garner*, 471 U.S. at 3. The reasonableness of force must be judged from the perspective of a reasonable officer on the scene, without the benefit of hindsight. *Graham*, 490 U.S. at 396–97. This inquiry is necessarily fact-intensive and requires consideration of the particular circumstances in each case. *Id*. When evaluating the reasonableness of deadly force, courts look "primarily at the threat present *at the time* the force is deployed." *Dimock, Tr. for Heirs of Dimock-Heisler v. City of Brooklyn Center,* 124 F.4th 544, 552 (8th Cir. 2024) (emphasis in original) (citation omitted). This scrutiny is particularly warranted where, as here, the alleged facts suggest the officers had time to assess the nature of the threat before deploying deadly force.

Taking the allegations in the Amended Complaint as true, as is required at this stage, the Court finds that Plaintiff has adequately alleged a violation of T.J.'s Fourth Amendment rights. The Amended Complaint asserts that at the time Defendants deployed deadly force, T.J. was not pointing his weapon at any of the officers, but rather was beginning to raise it toward his own head. [ECF No. 30 ¶ 33]. The Amended Complaint further alleges that he did not have his finger on the trigger, had not threatened anyone other than himself, and had been looking down at his cell phone for several seconds before being shot. *Id*. ¶¶ 40, 42, 45. Moreover, after having been shot twice and falling to the ground, dropping his gun, T.J. was shot another 12 times. These factual allegations, when viewed in the light most favorable to Plaintiff, plausibly establish that T.J. did not pose an immediate threat to the officers or others at the time deadly force was employed.

Defendants' contention that the use of deadly force was justified because T.J. was "moving the gun around" in a menacing fashion is not supported by the facts pled in the Amended Complaint. The pleading specifically alleges that "[a]t all times while raising his hand, the muzzle of the handgun was pointed to T.J.'s immediate left and not in the direction of any officer," and that T.J. had his gun pointed "upward toward his head." *Id*. ¶¶ 33, 34. Plaintiff further alleges that

Officer Howard, who was positioned closest to T.J.'s left, did not fire his weapon, which supports the inference that T.J. was not pointing the gun in a threatening manner toward the officers.  *Id*. ¶ 37.

The Court acknowledges the general principle that officers need not wait until a suspect points a weapon directly at them before using deadly force.  *See Sinclair v. City of Des Moines*, 268 F.3d 594, 596 (8th Cir. 2001).  However, accepting the Amended Complaint's allegations as true, this is not a case where officers faced immediate, split-second decisions to prevent the imminent use of a firearm against them.  Rather, T.J. had been in the officers' presence for approximately four minutes, had verbally expressed suicidal ideation rather than threats toward others, and was raising his weapon toward himself when shot.  These allegations plausibly suggest that the officers' use of deadly force was objectively unreasonable under the circumstances.

2.    Clearly Established Law

Even if a constitutional violation is established, qualified immunity still shields officers from liability unless the right was "clearly established" at the time of the violation.  A right is clearly established when it would be "sufficiently clear that every reasonable official would have understood that what he is doing violates that right."  *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (*per curiam*) (citation omitted).  The qualified immunity standard gives "government officials breathing room to make reasonable but mistaken judgments" and "protects all but the plainly incompetent or those who knowingly violate the law." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) (cleaned up) (citation omitted).  Although this standard does not "require a case directly on point [] existing precedent must have placed the statutory or constitutional question beyond debate."  *Id*. at 741.

The Supreme Court has cautioned against defining clearly established law at a high level of generality, particularly in the Fourth Amendment context where the reasonableness inquiry

"must be undertaken in light of the specific context of the case." *Mullenix*, 577 U.S. at 12 (citation omitted). At the same time, the Court has recognized that officials can be on notice that their conduct violates established law "even in novel factual circumstances," as the "salient question" is whether the law gave "fair warning" that the conduct was unconstitutional. *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). The United States Court of Appeals for the Eighth Circuit has consistently articulated certain principles governing the use of deadly force in cases involving armed individuals, though their application leads to different outcomes depending on the specific facts and procedural posture. The Court must therefore examine whether the officers in this case had fair notice that their actions, as alleged, would violate T.J.'s constitutional rights.

In *Cole v. Hutchins*, the Eighth Circuit affirmed the denial of qualified immunity to an officer who shot a man holding a gun that was pointed "vertically facing either the sky or the ground." 959 F.3d 1127, 1130 (8th Cir. 2020). The court recognized two critical principles. First, "it was clearly established that a person does not pose an immediate threat of serious physical harm to another when, although the person is in possession of a gun, he does not point it at another or wield it in an otherwise menacing fashion." *Id*. at 1134. Second, "it was clearly established that a few seconds is enough time to determine an immediate threat has passed, extinguishing a preexisting justification for the use of deadly force." *Id*. *Cole* derived these principles from prior Eighth Circuit precedent establishing that an individual does not pose an immediate threat when possessing a firearm but not raising it toward another or appearing "ready to shoot." *Nance v. Sammis*, 586 F.3d 604, 611 (8th Cir. 2009).

The *Cole* court further reinforced these principles by citing a "robust consensus of cases of persuasive authority." *Cole*, 959 F.3d at 1134; *see also Cooper v. Sheehan*, 735 F.3d 153, 159 (4th Cir. 2013) (recognizing that "an officer does not possess the unfettered authority to shoot" someone

7

"because that person is carrying a weapon" but only when "the officer or another person is threatened with the weapon") (emphasis omitted); *Perez v. Suszczynski*, 809 F.3d 1213, 1220 (11th Cir. 2016) (holding "the mere presence of a gun or other weapon is not enough to warrant the exercise of deadly force"); *George v. Morris*, 736 F.3d 829, 838–39 (9th Cir. 2013) (noting it would be objectively unreasonable to use deadly force if a person held a gun "trained on the ground" without making a "furtive movement, harrowing gesture, or serious verbal threat"); *King v. Taylor*, 694 F.3d 650, 662–63 (6th Cir. 2012) (concluding that deadly force against a suspect holding a gun was unreasonable if the individual "did not point [the] gun towards the officers just before he was shot").

More recent Eighth Circuit cases have found qualified immunity appropriate in different factual contexts. In one case, the court granted qualified immunity to officers who used deadly force when a suspect "reached for a loaded gun and began to raise it" after officers attempted to apprehend him. *Aden v. City of Bloomington*, 128 F.4th 952, 960 (8th Cir. 2025). The court emphasized that "officers need not wait to act until they are staring down the barrel of a loaded gun." *Id*. at 959. Similarly, the Eighth Circuit granted qualified immunity to an officer who shot a woman holding a gun during a domestic disturbance, finding that even if the officer's decision to shoot without warning was objectively unreasonable, it did not violate clearly established law given the "tense, uncertain, and rapidly evolving" situation. *Morgan-Tyra v. City of St. Louis* 89 F.4th 1082, 1088 (8th Cir. 2024) (quoting *N.S. ex rel. Lee v. Kan. City Bd. of Police Comm'rs*, 35 F.4th 1111, 1114 (8th Cir. 2022)).

However, these cases are distinguishable from the present matter in several critical respects. First, both *Aden* and *Morgan-Tyra* were resolved at the summary judgment stage after development of a factual record, whereas *Cole* involved the denial of qualified immunity at

summary judgment. The present case involves a motion to dismiss, where the Court must accept all well-pleaded allegations as true. This procedural posture significantly affects the qualified immunity analysis because Defendants "must show that they are entitled to qualified immunity on the face of the complaint." *Dadd v. Anoka Cnty.*, 827 F.3d 749, 754 (8th Cir. 2016) (quoting *Bradford v. Huckabee*, 394 F.3d 1012, 1015 (8th Cir. 2005)).

Second, the factual distinctions are significant. Unlike in *Aden*, where the suspect reached for a gun that had been placed on the ground as officers were moving in to apprehend him, the Amended Complaint alleges that T.J. was already holding his gun throughout the four-minute interaction with officers. And in contrast to *Morgan-Tyra*, where the court described a "high-pressure" situation where the suspect was "holding a gun while shouting expletives at someone [the officer] could not see," 89 F.4th at 1086, the Amended Complaint alleges T.J. had verbally expressed suicidal rather than homicidal intentions and was looking at his cell phone with the gun pointed away from officers when they opened fire.

The facts in both *Aden* and *Morgan-Tyra* present circumstances that precipitated split-second judgments—the very scenario qualified immunity is intended to address. In *Aden,* after a near three-hour standoff, officers were executing a tactical plan to apprehend the decedent by deploying three flashbangs and striking him with foam bullets. 128 F.4th at 956. During this commotion, the decedent moved toward, retrieved, and began raising the gun. *Id*. Similarly in *Morgan-Tyra*, the Eighth Circuit characterized the situation as "about as high pressure as it gets." 89 F.4th at 1086. There, the plaintiff was armed, had threatened others with a gun, and was agitated while shouting expletives at another person the officer could not see. *Id*. The plaintiff herself acknowledged trying "'to use [her] words to intimidate' and make the other person 'believe [she] would shoot.'" *Id*. at 1085 (alteration in original).

9

Here, by contrast, the allegations paint a different picture. T.J initially retreated into the corner of the living room upon the officers' arrival. Thereafter, his behavior remained relatively consistent. He engaged in coherent conversation with the officers and periodically looked at his phone during the encounter. T.J. was still looking at his phone which was in one hand and continued to point the gun toward his head as he made a subtle movement raising his arm. Moreover, he had not said anything which could have been considered threatening or menacing to anyone other than himself. The officers maintained their positions around T.J. for several minutes during which the interaction did not appreciably escalate. T.J. was also a child, and known to be so by officer, unlike the suspects in both *Aden* and *Morgan-Tyra*. While officers may have perceived this as a tense situation, the circumstances as alleged were substantially different from those in *Aden* and *Morgan-Tyra*.

Indeed, the facts alleged here align more closely with *Cole*, where the court found that an officer violated clearly established law by shooting a suspect who was not pointing his weapon at anyone when shot. Both cases share critical factual similarities: the suspects were holding firearms not aimed at officers or others, and both were moving in ways that diminished rather than increased any potential threat—the decedent in *Cole* by retreating down porch steps and turning away from the door, and T.J. by allegedly retreating to the corner of the room and raising the gun toward his own head instead of toward the officers.

Additional Eighth Circuit precedent further supports the conclusion that the law was clearly established. The court has found the use of deadly force objectively unreasonable where an individual held "the gun overhead, pointed upward." *Craighead v. Lee*, 399 F.3d 954, 961 (8th Cir. 2005). In *Craighead*, the panel had "no hesitancy in saying that the facts alleged, taken in the light most favorable to [the decedent's] heirs and next of kin, show that [the officer's] use of deadly

force was objectively unreasonable." *Id*. This conclusion held even though the decedent was struggling with another person while holding the gun and the shooting occurred within seconds of the officer's arrival. *Id*. The panel determined that the decedent could not have posed a significant threat to the officers because the pistol was continuously held over the decedent's head, pointed upward. *Id*.

In *Estate of Morgan v. Cook*, the Eighth Circuit affirmed qualified immunity for an officer who shot a man holding a kitchen knife after the man "raised his right leg as if to take a step" toward the officer. 686 F.3d 494, 496 (8th Cir. 2012). Critical to the court's analysis was that the suspect failed to comply with the order to drop the knife and began to move toward the officer, creating an immediate threat. *Id*. Here, by contrast, the Amended Complaint alleges that T.J. was raising the weapon toward himself, not toward the officers, and was looking at his cell phone seconds before the shooting—factual distinctions that materially differentiate this case from *Estate of Morgan*.

Similarly, in *Rogers v. King*, qualified immunity protected officers who shot a woman holding a handgun during a suicide intervention after she "refused to comply" with commands to drop the firearm and "pointed her gun" at one of the officer's shins. 885 F.3d 1118, 1120 (8th Cir. 2018). The court emphasized that the decedent's failure to follow the commands of the officers to drop the weapon "escalated" the situation. *Id*. at 1121–22. The present case is readily distinguishable; although T.J. had repeatedly been told to put the gun down, the situation was not escalating at the moment officers fired. Rather, the officers were actively engaging him in dialogue, he was looking at his phone, and most significantly, T.J. kept his gun pointed at the floor or toward himself, not at the officers. Moreover, once T.J. was on the ground, having been shot twice and dropped his gun, officers continued to fire 12 shots into his prone body.

Most instructive is *Partridge v. City of Benton*, where the Eighth Circuit reversed a grant of summary judgment for officers who fatally shot a suicidal teen who was moving a gun away from his head.  929 F.3d 562 (8th Cir. 2019).  The court reasoned that "the mere presence of a gun or other weapon is not enough to warrant the exercise of deadly force" without other facts supporting an imminent threat.  *Id*. at 566–67 (citation omitted).  The court specifically noted that the decedent's movement of the gun away from his head may have been an attempt to comply with law enforcement's commands to drop the gun.  *Id*. at 566.  This case bears striking parallels to the situation alleged here—both involve suicidal teenagers who were shot while moving guns they had initially pointed at themselves.

Furthermore, *Partridge* was decided on a motion for judgment on the pleadings, which applies the same standard as a motion to dismiss.  *See Ginsburg v. InBev NV/SA*, 623 F.3d 1229, 1233 n.3 (8th Cir. 2010) ("As a general rule, a Rule 12(c) motion for judgment on the pleadings is reviewed under the same standard as a 12(b)(6) motion to dismiss.").  The Eighth Circuit emphasized the significance of this standard in its analysis, noting that the "complaint does not tell the direction or speed [the decedent] moved the gun, how far he moved it before [the officer] shot him, or the timing of the facts.  The complaint does not give [the officer's] views." *Partridge,* 929 F.3d at 566.  The court observed that based on the complaint, the decedent could have been slowly complying with the officers' commands to drop the gun, in which case a reasonable officer would have recognized that using deadly force was excessive.  "Based on all reasonable inferences," the panel could not "conclude that [the officer's] actions were objectively reasonable." *Id*.

Taken together, these cases establish a clear principle: officers may not use deadly force against an armed individual who is not pointing the weapon at officers or others and whose

movements do not objectively indicate an immediate threat.  The mere presence of a weapon, without more, does not justify deadly force—particularly where, as alleged here, T.J.'s conduct and statements indicated he posed a danger only to himself.

Applying these principles to the allegations in the Amended Complaint, T.J.'s Fourth Amendment right to be free from excessive force was clearly established in December 2022.  The Amended Complaint alleges that T.J. made statements expressing his desire to die, kept the muzzle of his handgun pointed at the floor during most of the encounter, was not pointing his gun at the officers at the time of the shooting, did not have his finger on the trigger, and was beginning to raise the gun toward his own head when the officers shot him.  These allegations plausibly establish that T.J. posed a threat to himself, but not to the officers or others, at the time deadly force was used.

The principle established in *Cole*—that mere possession of a firearm does not constitute an immediate threat without threatening conduct—squarely applies to the present allegations.  According to the Amended Complaint, T.J. was raising his gun with the muzzle pointed toward his own head, not in the direction of any officer.  Such conduct falls precisely within the category of armed-but-non-threatening behavior that the Eighth Circuit has recognized as insufficient to justify the use of deadly force.  *Cole*, 959 F.3d at 1134.

### III.    CONCLUSION

The Court recognizes the difficult and dangerous situations that law enforcement officers face, and acknowledges that they often must make split-second judgments in circumstances that are tense, uncertain, and rapidly evolving.  *Graham*, 490 U.S. at 396–97.  These challenges are precisely why qualified immunity exists—to provide officers the necessary latitude to perform their duties without fear of legal liability for reasonable, though mistaken, judgments.  Yet the

doctrine is not impenetrable.  It protects officers who make reasonable assessments of threatening situations, not those who act in ways that, if the allegations in the Amended Complaint prove true, would contradict clearly established principles governing the use of deadly force.

The Court emphasizes that this ruling addresses only whether the Amended Complaint alleges sufficient facts to overcome qualified immunity at the pleading stage; it makes no determination as to the ultimate merits of Plaintiff's claims.  In other words, the Court's task is limited—to assess whether the Amended Complaint plausibly alleges a violation of clearly established law.  The allegations here—that officers used deadly force against a suicidal teenager who never pointed his weapon at them, who kept the gun directed at the floor or toward himself, and who had expressed self-harm rather than threatening intentions—sufficiently allege conduct that falls beyond the protection of qualified immunity.  While discovery may reveal facts that alter this analysis, the motion to dismiss standard requires the Court to accept the well-pleaded allegations as true and draw all reasonable inferences in Plaintiff's favor.  Under this standard, the Court cannot conclude that qualified immunity shields the Defendants from liability as a matter of law.  For the foregoing reasons, Defendants' Motion to Dismiss is DENIED.  [ECF No. 32].

IT IS SO ORDERED.

Dated this 28th day of March, 2025.

_____
STEPHANIE M. ROSE, CHIEF JUDGE
UNITED STATES DISTRICT COURT