IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| MONICA WOODS, Administrator for Estate of T.J.,<br><br>Plaintiff,<br><br>v.<br><br>CITY OF DES MOINES, DANA WINGERT, in his Official Capacity as Chief of Police for the City of Des Moines, Iowa, THOMAS GARCIA, Individually and in his Official Capacity as a Police Officer for the City of Des Moines, Iowa, NOAH BOLLINGER, Individually and in his Official Capacity as a Police Officer for the City of Des Moines, Iowa, and ZACHARY DUITSCHER, Individually and in his Official Capacity as a Police Officer for the City of Des Moines, Iowa,<br><br>Defendants. | Case No. 4:23-cv-00520-SMR-SBJ<br><br>COMBINED ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND MOTION TO SEAL |

This case arises from the death of T.J., a 16-year-old shot by Des Moines police officers after an armed standoff in his grandmother's home. When Defendants moved to dismiss, the Court accepted the allegations of the amended complaint as true and held that they described a violation of clearly established law. The record now tells a fuller story. Even accepting Plaintiff's account of the final moment, the Court concludes that a reasonable officer in that room could have believed that T.J. was about to fire. T.J.'s death was a tragedy. But the Fourth Amendment judges an officer's decision by what he reasonably perceived when he made it. It does not require an officer who reasonably believes that his life or another's is in danger to wait until the danger is certain. The Court grants summary judgment on the federal claims and declines to exercise supplemental jurisdiction over the claims under Iowa law. It also denies Defendants' motion to keep the body-

worn camera recordings and other materials under seal. The public is entitled to see the evidence on which the Court's judgment rests.

## I. BACKGROUND

### *A. Factual Background*

Shortly after midnight on December 26, 2022, T.J.'s stepfather, who lived in an apartment at 400 East McKinley Avenue in Des Moines, called 911. He reported that T.J., his wife's 16-year-old son, was outside that apartment with a handgun. [ECF Nos. 62-1 ¶ 1; 74-2 ¶ 1]. Dispatch relayed the call as a domestic disturbance involving a weapon, described T.J. as a 16-year-old wearing black clothing with a black pistol in his hand, and advised that he was believed to have an outstanding warrant. [ECF No. 62-1 ¶ 1].

Officers Noah Bollinger and Thomas Garcia responded together. *Id.* ¶ 2. While en route, Bollinger took a call from another officer and put it on speakerphone so that Garcia could hear. *Id.* ¶¶ 3–4. That officer knew T.J. and described him as a known gang member who had appeared in social-media posts with several firearms, including an AK-47-style weapon. He added that the teenager had run from police before and thrown a gun, that he might run again or do something worse, and that his brother had recently been killed. *Id.* ¶ 5.

Bollinger and Garcia arrived and spoke with T.J.'s mother and stepfather, who pointed them toward a nearby apartment. *Id.* ¶¶ 6–9. T.J. lived there with his grandmother. [ECF No. 62-2 at 509]. Garcia saw T.J. just inside the front door. [ECF No. 62-1 ¶ 11]. T.J. fled through the apartment toward a rear sliding glass door, and the officers followed him in, Garcia first and Bollinger close behind. [ECF Nos. 62-1 ¶¶ 12–13; 74-2 ¶ 3]. They found him several feet away in the living room, holding a handgun in his right hand, pointed at the floor. His grandmother was seated on a couch in the same room. [ECF Nos. 62-1 ¶¶ 16–17; 74-2 ¶ 5]. With their handguns

pointed at T.J., both officers shouted repeatedly for him to drop the gun. [ECF Nos. 62-1 ¶¶ 18, 31; 74-2 ¶ 4]. T.J. told his grandmother to leave. He did not put the gun down. [ECF Nos. 62-1 ¶ 19; 74-2 ¶ 8].

Officers Zachary Duitscher and Nicholas Howard, who had responded separately, reached the rear glass door about the same time. [ECF Nos. 62-1 ¶¶ 10, 20; 74-2 ¶ 6]. Duitscher had gone around the building to cut off an escape route and could not see inside. [ECF No. 62-1 ¶¶ 15, 21]. Both officers heard shouting from within. *Id.* ¶ 22. Duitscher testified that he also heard what sounded like a physical scuffle and thought the officers inside were fighting with a suspect he believed was armed. [ECF No. 62-2 at 236]. Howard testified that he could hear the officers commanding someone to put a gun down and knew he needed to be inside to support them in a dangerous situation. *Id.* at 448–49.

The door would not open, so Duitscher broke out a portion of the glass, and the two entered that way. [ECF Nos. 62-1 ¶¶ 23–25; 74-2 ¶ 7]. T.J. retreated to the northeast corner of the living room. [ECF Nos. 62-1 ¶ 26; 74-2 ¶ 9]. His grandmother left the room. [ECF No. 62-1 ¶ 28]. Within about a minute of the first officers' entry, all four were in the living room, each pointing his firearm at T.J. *Id.* ¶ 29. They stood three to six feet away, their lights shining on him. [ECF No. 74-2 ¶ 10].

What followed lasted about four minutes and twenty seconds. [ECF No. 62-1 ¶ 85]. The officers gave repeated, loud commands for T.J. to put the gun down, some of them profane. *Id.* ¶ 31. They told him more than once that they did not want to hurt him. *Id.* ¶ 35. Civilians in the apartment also urged him to drop it. *Id.* ¶¶ 34, 59.

Bollinger took the lead in talking with him. *Id.* ¶ 39. He had met T.J. before, and he asked whether T.J. remembered him from B-Bops. [ECF Nos. 62-1 ¶ 37; 74-2 ¶ 16]. On that occasion,

Bollinger had stopped T.J.'s car and learned he had no license. When he learned that T.J. was on his way to get food for himself and his grandmother, Bollinger drove him to the restaurant in the front seat of his patrol car, paid for their meals, and talked with him about leaving gang life behind. [ECF No. 62-1 ¶ 38]. T.J. told him, "I know you. I can talk to you." [ECF No. 74-2 ¶ 16].

Much of the conversation concerned the officers' gun-mounted lights. T.J. asked repeatedly that they be turned off. "Them flashlights are triggers," he said, and he told the officers they could keep their guns aimed at him so long as they took the lights off. [ECF Nos. 62-1 ¶ 41; 74-2 ¶¶ 13, 16]. Duitscher turned his light off. Bollinger told T.J. the rest would come off after he put the gun down. About two and a half minutes later, Howard turned his off too, but Bollinger and Garcia kept theirs on T.J. [ECF Nos. 62-1 ¶¶ 42, 48–49, 72; 74-2 ¶¶ 19–20].

T.J. told the officers, "My brother just died to a gun." [ECF Nos. 62-1 ¶ 44; 74-2 ¶¶ 14, 16]. Early in the encounter, holding the gun up with its muzzle toward the ceiling, he told the officers, "I'm gonna put this down." But he kept hold of it. [ECF Nos. 62-1 ¶ 36; 74-2 ¶¶ 15–16]. He took out his phone, glanced at it, put it away, and kept talking with Bollinger. [ECF No. 74-2 ¶¶ 17–18]. Then he fell quiet. For about half a minute he stood with the gun pointed at the floor. He crossed his arms, the gun still in his hand, wiped his eyes, and said, "I wanna die. I wanna be with my brother." [ECF Nos. 62-1 ¶¶ 55–56; 74-2 ¶ 21]. Bollinger told him he would talk for as long as T.J. wanted. [ECF No. 62-1 ¶ 61]. T.J. asked whether he was going to jail, and Bollinger said he would have to. "I'm gonna die," T.J. answered. [ECF Nos. 62-1 ¶ 62; 74-2 ¶ 22]. Moments later he said, "I need to see my mother. I need to see my mother, please." [ECF Nos. 62-1 ¶ 69; 74-2 ¶ 23]. Plaintiff asserts that no one responded, while Defendants point to Bollinger's reply, "I know." [ECF Nos. 74-2 ¶ 24; 77-2 at 8]. A woman had asked earlier to come into the room to speak with T.J., and Duitscher had declined that request. [ECF No. 62-1 ¶ 54]. He testified that,

with T.J. armed, he did not want to add another potential victim to the situation. [ECF Nos. 62-1 ¶ 70; 62-2 at 354].

T.J. moved the gun at several points during the encounter, and the parties dispute how far and in what direction. [ECF Nos. 62-1 ¶¶ 32, 43, 45; 74-1 ¶¶ 4, 12, 14]. For most of the time, he held it down at his side or pointed it at the floor. [ECF Nos. 68 at 26; 74-2 ¶¶ 5, 21].

In the final minute T.J. took out his phone again, holding it in his left hand with the gun still in his right. [ECF No. 62-1 ¶ 73]. He placed a video call to his brother, which connected and was running when the shooting occurred. [ECF No. 74-2 ¶¶ 26, 29]. Garcia said, "Please man, we don't want to do this." Looking down at his phone, T.J. answered, "This is what you wanted right here." Garcia said, "No, we don't wanna do this man." *Id*. ¶ 27.

Seconds later, T.J. raised the arm holding the gun. The parties dispute the nature of that movement. Plaintiff contends that T.J. kept his arm parallel to his body, with his hand rotated inward and the muzzle angled upward toward his own head. Defendants contend that the gun came up in the direction of Duitscher and Howard. [ECF Nos. 62-1 ¶ 76; 74-2 ¶ 28].

Duitscher fired first, and Bollinger and Garcia fired after him. [ECF No. 62-1 ¶ 77]. Neither decided to fire until after he heard Duitscher's first shot, and both believed T.J. had shot at Duitscher. [ECF Nos. 62-1 ¶¶ 78–79; 74-2 ¶ 32]. T.J. fell and dropped the handgun as additional shots were fired. [ECF No. 74-2 ¶ 29]. The shooting lasted approximately four seconds, after which Duitscher called to hold fire and the others promptly complied. [ECF No. 62-1 ¶¶ 80, 82]. Duitscher fired three rounds, Bollinger three, and Garcia eight—fourteen in all. *Id.* ¶ 81. Howard, standing to Duitscher's right, did not fire. [ECF Nos. 62-1 ¶ 81; 74-2 ¶ 33]. T.J. fired no shots. [ECF No. 74-2 ¶ 31].

Immediately afterward, Bollinger asked Duitscher whether he had been hit. Duitscher told him that T.J. had not fired. [ECF No. 62-1 ¶ 84]. The officers handcuffed T.J. and began emergency aid. *Id.* ¶ 83. He was taken to Methodist Hospital, where he was pronounced dead. *Id.* ¶ 87.

*B. Procedural Background*

Monica Woods, T.J.'s mother, brings this action as the administrator of his estate. She sues the City of Des Moines ("City") and its chief of police, Dana Wingert, in his official capacity. She also sues Duitscher, Bollinger, and Garcia, both individually and in their official capacities. [ECF No. 30 at 1]. Howard is not a party. The amended complaint asserts ten counts. Counts I through III claim that each officer used excessive force in violation of the Fourth Amendment. *Id.* ¶¶ 57–86. Counts IV and V claim that the City and Chief Wingert are liable under Section 1983 for failing to adopt and enforce adequate policies and training on the use of deadly force and on de-escalation. *Id.* ¶¶ 87–102. Counts VI through X arise under Iowa law. They allege negligence by the officers and by Chief Wingert, and they seek to hold the City and Chief Wingert liable for the officers' conduct under the doctrine of *respondeat superior*. *Id.* ¶¶ 103–34.

Defendants moved to dismiss the federal claims on the ground of qualified immunity. [ECF No. 32]. The Court denied the motion, cautioning that its ruling addressed only the sufficiency of the allegations, not the merits. [ECF No. 41 at 14]. After discovery, Defendants moved for summary judgment on every count and moved to file certain supporting materials under seal. [ECF Nos. 57, 62].

II. MOTION TO FILE UNDER SEAL

Before turning to the merits, the Court addresses Defendants' Motion to File Summary Judgment Documents Under Seal, which Plaintiff resists. [ECF Nos. 57, 60]. On

January 15, 2026, the Court directed that the materials be filed under seal so that briefing could proceed, expressing no view on the motion. [ECF No. 66]. The Court now denies it.

*A. Background and Legal Standard*

Defendants ask the Court to keep nine items under seal: the four officers' body-worn camera recordings, the police dispatch recording, supplemental reports by Officers Grant Purcell and Brian Foster, and transcripts of the Division of Criminal Investigation's interviews of Duitscher and Bollinger. [ECF No. 57-1 at 3–4]. They advance two grounds. First, they argue that Federal Rule of Civil Procedure 5.2 requires that T.J.'s identity be protected, and that the audio and video recordings cannot be effectively redacted. *Id.* at 4–6. Second, they argue that all nine items are confidential under Iowa Code section 232.149(2), which protects the records of a criminal justice agency concerning a child involved in a delinquent act, and that disclosing them would be a serious misdemeanor under section 232.151. *Id.* at 6–8. Defendants also contend that Plaintiff's resistance cannot be squared with her own request for the August 2025 confidentiality order, which treats as confidential any information a statute prohibits from disclosure. *Id.* at 8.

The public has a common-law right of access to judicial records. *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 597 (1978). The right is not absolute. *Id*. at 598. A court asked to seal must first decide whether the materials are judicial records. If they are, a presumption of public access attaches, and the court must then decide whether the party seeking to prevent disclosure has overcome it. *Flynt v. Lombardi*, 885 F.3d 508, 511 (8th Cir. 2018). That second question requires weighing the interests served by public access against the interests served by confidentiality. *IDT Corp. v. eBay*, 709 F.3d 1220, 1223 (8th Cir. 2013). The presumption may be overcome by compelling reasons. *Flynt*, 885 F.3d at 511.

How much weight the presumption carries depends on the role the materials play in the exercise of Article III judicial power. *IDT*, 709 F.3d at 1224. Judicial records fall along a continuum. At one end are materials that directly affect an adjudication; at the other are materials that play no part in the court's decision. *Id.* at 1223. Records that determine litigants' substantive rights sit at the first end, where the presumption carries its greatest weight. *See id.* at 1224.

### *B. Analysis*

#### 1. The Weight of the Presumption

These materials are judicial records that sit at the end of the continuum where the presumption carries its greatest weight.

Defendants said as much when they filed the motion. Their first numbered paragraph states that they "will rely on these documents in their motion for summary judgment." [ECF No. 57 ¶ 1]. Their brief adds that the recordings are "imperative for the court's consideration of the totality of the circumstances" and that "the unaltered video is necessary to evaluate the reasonableness of the force used." [ECF No. 57-1 at 5]. Defendants offered those statements to explain why redaction would not do. They also establish what the materials are.

The Court's reliance on them confirms it. The central factual dispute, as the analysis below explains, is what T.J. did with his right arm at 12:40:25 a.m. The Court resolves that dispute by reviewing the four body-worn camera recordings and determining that they do not blatantly contradict Plaintiff's account. The analysis also draws on the dispatch call, on what T.J. said during the encounter, on how long the encounter lasted, and on the officers' testimony about what they perceived. Materials that a court reviews to decide which version of a disputed fact governs, and on which it rests a judgment, directly affect an adjudication in every sense.

Senior United States District Judge James E. Gritzner reached the same conclusion in a case where the materials played a more limited role. In *Steele v. City of Burlington*, the parties settled before the court could rule on cross-motions for summary judgment, so the materials filed with those motions never determined anyone's rights. 334 F. Supp. 3d 972, 975–76 (S.D. Iowa 2018). Judge Gritzner nonetheless found that they carried a heightened presumption of access. *Id.* at 981. The presumption here is stronger still, because the Court relies on these materials to decide the motion for summary judgment.

2. Iowa Law and the Other Asserted Interests

The public's interest in these particular records reinforces the presumption. The right of access exists in part so that citizens can keep "a watchful eye on the workings of public agencies." *Nixon*, 435 U.S. at 598. These records show how public officers used deadly force against a teenager. Against the weight of that interest, Defendants offer Iowa Code section 232.149(2).

The Court assumes without deciding that the nine items are confidential under that section. It need not decide more. When Defendants earlier sought a protective order on the same ground, United States Magistrate Judge Stephen B. Jackson, Jr., declined to construe section 232.149 as applied to these materials, observing that doing so would amount to an advisory opinion. [ECF No. 21 at 8–10]. The assumption does not carry Defendants where they need to go.

Defendants concede that records designated confidential under state law are not, *per se*, required to be filed under seal in federal court. [ECF No. 57-1 at 7]. That concession reflects the governing rule. These are the records of a federal court. If their availability turned on state confidentiality rules, materials for which the presumption of access carries its greatest weight could be withheld whenever state law so provided. *Steele*, 334 F. Supp. 3d at 982; *cf. United States v. Story County*, 28 F. Supp. 3d 861, 877 (S.D. Iowa 2014) (observing that Iowa's public records

law would have to give way to federal law governing federal records). The recognized exception is where Congress has spoken to the issue. *Steele*, 334 F. Supp. 3d at 982. Congress has not spoken here.

Defendants also worry that denying the motion would force them to choose between committing a serious misdemeanor and defending this case. It would not. Defendants filed these materials under seal at the Court's direction. Whether they are open to the public is for this Court to decide. If the materials become public, it will be by the Court's order, not through Defendants' own disclosure.

That is not to say that the policy reflected in section 232.149 is irrelevant. The closest authority for Defendants' position—though they do not cite it—upheld the sealing of a court file over a newspaper's objection. *Webster Groves Sch. Dist. v. Pulitzer Publ'g Co*., 898 F.2d 1371, 1377 (8th Cir. 1990). The Eighth Circuit held that the newspaper's interest in access was outweighed by a minor's privacy interest and by the State's interest in protecting minors from the public dissemination of hurtful information. *Id*. In weighing those interests, the court looked to state and federal statutes alike, including Missouri's provisions for the confidentiality of juvenile records, as evidence of a strong public policy favoring the protection of minors' privacy. *Id*. at 1375. State law may thus inform the weight of the interest on the other side of the scale, even though it does not control the outcome.

Here that interest carries little weight, and a comparison with *Webster Groves* shows why. In that case, the student was 14 years old and still enrolled in school. *Id.* at 1373. The file held psychological testimony, evaluations of his disability, and his educational records; redaction was "virtually impossible." *Id.* at 1375–77. His guardian asked that the case be closed to the public.

*Id.* at 1373. And the court's concern looked forward: the student could be "stigmatized and humiliated" if the record were made public. *Id.* at 1377.

Little of that is true here. The concern that animated *Webster Groves*—stigma that would follow a child into the years ahead—does not carry the same force. These materials concern the conduct of police officers during the encounter, not T.J.'s education or his health. Much of their substance is already public: the Attorney General's published account describes the encounter in detail while identifying T.J. only by his initials. [ECF No. 62-2 at 506–19]. His mother, as administrator of his estate, asks that the materials be made public. And the one piece of information that raises a genuine concern, T.J.'s name, is addressed through redaction, as discussed below. The party asking the Court to keep these records from the public is the City, in support of a motion seeking judgment that its officers acted lawfully.

Nor does the parties' stipulated August 2025 confidentiality order help Defendants. It states that it does not by itself authorize the filing of any document under seal, that a designation is not a judicial determination that anything is entitled to protection, and that a party or interested member of the public may challenge a sealing, with the burden on the party asserting confidentiality. [ECF No. 53 ¶¶ 7, 13, 16]. Defendants agreed to those terms. Plaintiff's resistance is what paragraph 13 contemplates. And reliance on an order entered to facilitate discovery is a weak reason to keep summary judgment records from the public. *Steele*, 334 F. Supp. 3d at 984.

3. Redaction as the Alternative to Sealing

What remain are Defendants' reliance on Rule 5.2 and their related contention that the recordings cannot be redacted without distorting them.

Rule 5.2(a)(3) provides that a filing may include only the initials of an individual known to be a minor. Fed. R. Civ. P. 5.2(a)(3). The Rule says nothing about faces. *See* Fed. R. Civ.

P. 5.2(a). Rule 5.2(d) supplies no standard of its own; it confirms only that a court may order a filing made under seal, and that it may later unseal the filing or require a redacted version for the public record. Fed. R. Civ. P. 5.2(d); Fed. R. Civ. P. 5.2 advisory committee's note to 2007 adoption (explaining that subdivision (d) "does not limit or expand the judicially developed rules that govern sealing"). So the interest the Rule protects is a narrow one, and it calls for redaction rather than sealing.

That follows the general rule: before sealing, a court must consider whether redaction would suffice. *IDT*, 709 F.3d at 1224–25 (vacating an order that kept an entire complaint under seal because the district court had not explained why redaction was not a reasonable alternative). Defendants say it would not. Their brief asserts that cross-talk would make removing T.J.'s name from the audio difficult, but it offers no evidence in support. [ECF No. 57-1 at 5]. Whether redaction is practicable as to any particular recording is not something the Court can determine on the present showing, and Defendants have not made the showing item by item.

The Court will therefore follow the approach taken in *Steele*. Having concluded that the presumption of access had not been overcome, Judge Gritzner gave the parties an opportunity to propose narrow redactions of personal identifying information before the summary judgment materials were unsealed, and permitted no redactions of substance. *Steele*, 334 F. Supp. 3d at 985–86. Defendants shall have the same opportunity here, limited to the personal identifiers described in Rule 5.2(a) and to T.J.'s name. No substantive redactions will be permitted.

4. Conclusion

Defendants' Motion to File Summary Judgment Documents Under Seal is DENIED. [ECF No. 57]. Unsealing is held in abeyance as follows. Within 30 days of the date of this Order, Defendants shall file under seal a log identifying each redaction they propose to the materials filed

under seal in connection with the motion for summary judgment. For each proposed redaction, the log shall identify the item, its location by timestamp or page and line, and the information to be redacted. If Defendants contend that a particular recording cannot be redacted, they shall explain why in the same filing. Plaintiff may respond within 14 days of that filing. After reviewing the proposals, the Court will approve those that are consistent with this Order. Defendants will then have 30 days to apply the approved redactions and to file the redacted copies. The Court will enter an order unsealing the record.

## III. MOTION FOR SUMMARY JUDGMENT

With the question of public access resolved, the Court turns to the merits. Defendants move for summary judgment on all ten counts. [ECF No. 62]. The motion turns on one question: whether the three officers who fired on T.J. acted reasonably under the Fourth Amendment. The answer decides every federal claim. Because none of the officers violated T.J.'s constitutional rights, the claims against them fail, and the claims against the City and Chief Wingert fail with them. With no federal claim remaining, the Court declines to exercise supplemental jurisdiction over the claims arising under Iowa law.

### *A. Legal Standard*

#### 1. Summary Judgment

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it might affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over such a fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id.* The Court views the record in the light most favorable to the nonmoving party and gives that party

the benefit of all reasonable inferences. *Maser v. City of Coralville*, 139 F.4th 1004, 1008 (8th Cir. 2025). It does not weigh the evidence or judge credibility; those are functions of the jury. *Anderson*, 477 U.S. at 255. But the Court need not accept unreasonable inferences or sheer speculation as fact. *Maser*, 139 F.4th at 1008.

Two features of this case shape how those principles apply. First, much of what happened was recorded. When video evidence blatantly contradicts one party's version of events, the court views the facts in the light the video depicts. *Scott v. Harris*, 550 U.S. 372, 380–81 (2007). Short of that, the ordinary rule holds, and the court views the facts in the light most favorable to the nonmoving party. Second, whether an officer's use of force was objectively reasonable is a question of law. *Aden v. City of Bloomington*, 128 F.4th 952, 959 (8th Cir. 2025). The Court first determines the facts the record supports, viewing it in the nonmoving party's favor. Whether those facts justified the force used is then a question for the Court. *Liggins v. Cohen*, 971 F.3d 798, 801 (8th Cir. 2020).

2. Qualified Immunity

Qualified immunity shields a government official from liability and from the burdens of litigation unless his conduct violated "clearly established statutory or constitutional rights of which a reasonable person would have known." *Loch v. City of Litchfield*, 689 F.3d 961, 965 (8th Cir. 2012) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). An official is entitled to that protection unless the evidence, viewed in the light most favorable to the plaintiff, establishes two things: that he violated a constitutional right, and that the right was clearly established at the time. *Id*. A right is clearly established when existing precedent has placed the constitutional question beyond debate. *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). Courts may take up the two

questions in either order. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). If the official did not violate a constitutional right, the inquiry ends there. *See Maser*, 139 F.4th at 1010.

### *B. Excessive Force*

Plaintiff claims that each of the three officers who fired violated the Fourth Amendment. The three did not fire for the same reason, so the Court considers them separately. Duitscher fired in response to T.J.'s final movement. Bollinger and Garcia fired after hearing Duitscher's shot, believing it had come from T.J. The Court takes up each decision in turn, then addresses the shots fired after the first and the significance of Howard's decision not to fire. Each officer is entitled to summary judgment.

#### 1. Legal Standard

The Fourth Amendment protects the right to be free from unreasonable seizures. U.S. Const. amend. IV. An officer who shoots a person has seized him. *Tennessee v. Garner*, 471 U.S. 1, 7 (1985). That seizure is lawful only if it is objectively reasonable. *Graham v. Connor*, 490 U.S. 386, 397 (1989). Where the force is deadly, the officer must have had probable cause to believe that the suspect posed a significant threat of death or serious physical injury to the officer or to another. *Garner*, 471 U.S. at 3.

Reasonableness turns on the totality of the circumstances, judged from the perspective of a reasonable officer on the scene rather than with the 20/20 vision of hindsight. *Graham*, 490 U.S. at 396. The totality of the circumstances includes the events leading up to the use of force, not only the moment the force is used, although the situation at that moment will often matter most. *Barnes v. Felix*, 605 U.S. 73, 80–83 (2025).

Deadly force is justified where an armed suspect points a weapon at another person or takes a "similar 'menacing action.'" *Cole ex rel. Est. of Richards v. Hutchins*, 959 F.3d 1127, 1132 (8th

Cir. 2020) (citation omitted). Pointing is one way of establishing the threat, but not the only one. An officer may be justified in using a firearm before a suspect actually points a weapon at him, if the officer reasonably believes an imminent threat of serious harm exists. *Liggins*, 971 F.3d at 801; *see also Aden*, 128 F.4th at 959 (holding deadly force reasonable where a suspect picked up his gun and began to raise it, and officers fired before it reached knee height). It is likewise immaterial whether the weapon was ever aimed at a particular officer, so long as a reasonable officer would perceive its movement as threatening. *Maser*, 139 F.4th at 1010. What the suspect knew or intended does not answer the question. *Partlow v. Stadler*, 774 F.3d 497, 502 (8th Cir. 2014).

2. Officer Duitscher

a. The final movement

The analysis of Duitscher's decision begins with the movement that prompted it. With Duitscher a few feet away, T.J. brought the gun up. The parties disagree about its direction. In Plaintiff's telling, T.J. kept his hand rotated inward and brought the muzzle up toward his own head. Defendants maintain that he brought the gun up toward Duitscher and Howard. [ECF Nos. 62-1 ¶ 76; 74-2 ¶ 28].

The Court has reviewed the four body-worn camera recordings, and they do not blatantly contradict Plaintiff's description of the movement. *See Scott*, 550 U.S. at 380–81. The Court therefore accepts it. Even so, Duitscher is entitled to summary judgment. *See Maser*, 139 F.4th at 1008, 1010 (holding deadly force reasonable while assuming the suspect never pointed his rifle at the officers).

b. Probable cause

Viewed in context, T.J.'s movement gave a reasonable officer probable cause to believe that he posed a significant threat of death or serious physical injury. The officers had been

dispatched to a reported domestic disturbance involving a handgun, and they had been told that T.J. might have an outstanding warrant. [ECF No. 62-1 ¶ 1]. When they arrived, he ran from them into an occupied apartment. *Id.* ¶¶ 11–13, 16–17. By the final moment, four officers stood within a few feet of him in a small room, with little cover and with civilians nearby. [ECF Nos. 62-1 ¶¶ 29, 34; 62-2 at 511; 74-2 ¶ 10]. And for more than four minutes, T.J. had held a handgun with an extended magazine and refused every command to put it down. [ECF No. 62-1 ¶¶ 31, 36, 85, 105].

What T.J. said in the last minutes of the encounter also bore on how a reasonable officer would read what he did next. He said he wanted to die and be with his brother, and when Bollinger told him he would have to go to jail, he answered that he was going to die. [ECF Nos. 62-1 ¶¶ 56, 62; 74-2 ¶¶ 21–22]. Seconds before the final movement, Garcia pleaded that the officers did not want to do this. T.J., looking down at his phone, replied, "This is what you wanted right here." [ECF No. 74-2 ¶ 27]. Then he raised the gun. [ECF Nos. 62-1 ¶ 76; 74-2 ¶ 28].

The movement itself left little time to react. A handgun already in hand can be fired as soon as it is raised, and T.J. was only a few feet away. *See Liggins*, 971 F.3d at 801. T.J. had raised the gun before without any officer firing. [ECF No. 74-2 ¶¶ 11, 15]. But the officers refrained from firing then to give Bollinger's conversation with T.J. a chance to work. [ECF No. 62-2 at 464]. Duitscher held his fire at one earlier point because T.J.'s body language was still relaxed. *Id.* at 260. By the final movement, the circumstances had changed. The statements just described had come in the minute before, along with T.J.'s plea to see his mother. [ECF No. 74-2 ¶ 23]. And Bollinger described the final movement itself as quicker and tighter to the body than T.J.'s earlier gesturing. [ECF No. 62-2 at 82–84]. A reasonable officer in Duitscher's position could have concluded that T.J. was preparing to shoot, and the Fourth Amendment did not require Duitscher to hold his fire until the gun was aimed at him. *Aden*, 128 F.4th at 959; *Maser*, 139 F.4th

at 1010. *Maser* involved a rifle raised outward from the suspect's body, after threats against the officers. 139 F.4th at 1009–10. T.J. made no such threats, and on Plaintiff's account his hand was rotated inward. But *Maser* turned on whether a reasonable officer would perceive the movement as threatening in light of all the circumstances. *Id.* at 1010. The circumstances here differ, but they point the same way.

That T.J. was in crisis, and that his statements expressed an intention to harm himself, does not change the analysis. If anything, T.J.'s statements about harming himself allowed a reasonable officer to draw two conclusions: that he intended to shoot and kill himself, or that he intended to force the officers to shoot and kill him by threatening them, an outcome commonly known as "suicide by cop." When T.J. said he was going to die, Bollinger understood him to mean that he "was going to start shooting at us." [ECF No. 62-2 at 43]. Plaintiff acknowledges that Bollinger considered the possibility of suicide by cop. [ECF No. 74 at 24 n.9]. Even when a suspect is struggling with his mental health, his "mental state does not change the fact he posed a deadly threat to the officers and the public." *Hassan v. City of Minneapolis*, 489 F.3d 914, 919 (8th Cir. 2007). An officer's knowledge of a person's mental state may bear on whether force is reasonable, but it does not always change the answer. *See Dimock ex rel. Dimock-Heisler v. City of Brooklyn Center*, 124 F.4th 544, 553 (8th Cir. 2024). Nor does T.J.'s age. The Eighth Circuit found no Fourth Amendment violation where an officer shot a 16-year-old who was fleeing with a gun in his hand. *Liggins*, 971 F.3d at 799–801. What Duitscher confronted was a young man raising a gun a few feet away, in a room with civilians in it, who had just said things a reasonable officer could take to mean that he intended to die by gunfire, whether by his own hand or at the hands of the officers.

Plaintiff also emphasizes that the situation appeared to be de-escalating before the shots were fired. [ECF No. 74 at 25, 27]. Garcia testified that this was his general impression. [ECF No. 62-2 at 196]. Howard testified only that the officers were trying to de-escalate the situation, but that nothing had yet changed. *Id*. at 464–65. That the officers were working to talk T.J. into putting the gun down did not prevent a reasonable officer from perceiving a new and immediate threat when T.J. raised it. Reasonableness is judged objectively, and the situation at the moment force is used will often matter most. *Graham*, 490 U.S. at 397; *Barnes*, 605 U.S. at 80.

Taken together, the circumstances Duitscher confronted, what T.J. said in the final minute, and the movement itself gave Duitscher the probable cause the Fourth Amendment requires. That is so even accepting Plaintiff's account of the movement. T.J.'s mental state, his age, and the officers' efforts to de-escalate do not change the conclusion. Duitscher's use of deadly force was objectively reasonable. He did not violate T.J.'s Fourth Amendment rights.

c. *Partridge*, *Cole*, and the other authorities Plaintiff invokes

Plaintiff relies principally on three decisions the Court addressed in denying the motion to dismiss. The Court then measured those authorities against the allegations of the amended complaint, which it was required to accept as true. [ECF No. 41 at 3–4]. The developed record has displaced one premise of that earlier analysis. The Court read the amended complaint to allege that after T.J. was shot twice and dropped his gun, officers fired 12 more shots into him as he lay on the ground. *Id.* at 5, 11. In fact, the 14 rounds were fired by three officers in a matter of seconds, and Bollinger and Garcia fired only in response to Duitscher's shot. [ECF Nos. 62-1 ¶¶ 80–81; 74-2 ¶¶ 31–32]. The Court considers the authorities on the record as it now stands.

The closest case on Plaintiff's side is *Partridge*, in which the district court twice entered judgment for the officer and the Eighth Circuit twice reversed. *Partridge v. City of Benton*,

929 F.3d 562 (8th Cir. 2019) ("*Partridge I*") (reversing in part judgment on the pleadings); *Partridge v. City of Benton*, 70 F.4th 489 (8th Cir. 2023) ("*Partridge II*") (reversing summary judgment).[1] The Court earlier found striking parallels between *Partridge I* and the allegations of the amended complaint. [ECF No. 41 at 12]. Both cases involve a suicidal teenager shot while moving a gun he had held to his own head.

A closer look at the two decisions shows why the parallel does not carry to this record. In *Partridge I*, an officer found the teenager standing 45 feet away on a riverbank, ordered him to drop the gun, and shot him as he began to move it away from his temple. 929 F.3d at 564. The complaint did not say in what direction or at what speed he moved the gun, or what the officer believed he was doing. *Id*. at 566. The Eighth Circuit held that the pleaded facts permitted the inference that the teenager had been slowly lowering the gun away from the officer. *Id.* That movement, the court reasoned, would be "so obviously an attempt to comply" with the officer's commands that a reasonable officer would have known that firing was excessive. *Id.* (quoting *Partlow*, 774 F.3d at 503). The court also emphasized that the teenager was suspected of no crime and was neither resisting nor fleeing. *Id*. at 565.

On remand, the parties developed a record, and in *Partridge II* the dispute narrowed to whether he pointed the gun at the officers or lowered it away in compliance. 70 F.4th at 491. That dispute was genuine because a forensic pathologist testified that pointing the gun would have required an awkward and unnatural twisting of the wrist. From that testimony, a jury could find that the movement never happened. *Id*. at 491–92.

[1] The 2019 decision reviewed a judgment on the pleadings, not summary judgment. *Partridge I*, 929 F.3d at 564. The Court's order on the motion to dismiss described it both ways. [ECF No. 41 at 12]. The case was later tried, and the jury returned a verdict for the officer. *Partridge v. City of Benton*, 157 F.4th 970, 972 (8th Cir. 2025) ("*Partridge III*").

Both decisions turned on the possibility that the teenager was complying with the officer's commands, and that possibility is what separates them from this case. In *Partridge II*, whether the teenager pointed his gun at the officers was material only because, if he had not, a jury could find that he instead "moved his gun in compliance with commands to drop his gun." 70 F.4th at 492 (quoting *Partridge I*, 929 F.3d at 565, 567). No comparable alternative exists here. Plaintiff does not contend that T.J. was complying. On her own account, he raised the gun toward his head after four minutes in which he had not put it down despite repeated instructions from officers to do so. [ECF No. 74-2 ¶ 28]. That is not the movement *Partridge I* treated as obvious compliance with an order to drop a weapon, and it is not the movement *Partridge II* sent to a jury. The surrounding circumstances differ as well. T.J. was the subject of a reported armed domestic disturbance and possibly an outstanding warrant, and he fled from the officers into an occupied apartment. [ECF No. 62-1 ¶¶ 1, 11–13]. Additionally, the officer in *Partridge I* stood 45 feet away; Duitscher stood within a few feet of the gun.

*Partridge I* itself marks the line. In *Partlow*, officers shot a suicidal man who had walked out of his apartment building carrying a shotgun and, as they perceived it, turned toward them and raised the weapon. 774 F.3d at 500. The Eighth Circuit held that the officers' perception was objectively reasonable, even assuming that the man was in fact turning to set the gun down. *Id.* at 502–03. *Partridge I* distinguished *Partlow* because the complaint before it did not allege that the teenager moved to aim his gun, or that the officer believed he had. 929 F.3d at 567. This record presents what was missing there: a weapon being raised, and an officer who perceived the movement as a threat.

At the pleading stage, the Court found *Cole* most closely aligned with the allegations of the amended complaint. [ECF No. 41 at 10]. That alignment rested on the allegations that T.J.'s

gun was not aimed at officers and that he was raising it toward his own head. *Id*. But *Cole* turned on more than the direction of the weapon.

Officers in *Cole* responded to a report of an armed disturbance and arrived to find two men fighting in a front yard. 959 F.3d at 1130. The men stopped on their own. *Id.* The decedent walked to his vehicle, retrieved what witnesses took to be a rifle, and approached the other man's porch, holding the weapon upright, its barrel toward the sky or the ground and never toward the other man. *Id.* That man went inside and slammed the door. *Id.* at 1130–31. The decedent backed down the steps and turned away toward his vehicle. *Id.* Roughly five seconds later, the officer shot him five times without warning. *Id.* Because the case came to the Eighth Circuit on an interlocutory appeal from the denial of summary judgment on qualified immunity, the court accepted the facts as the district court had assumed them in the plaintiff's favor. *Id.* at 1131. On those facts, the court held the force objectively unreasonable. The decedent was neither pointing the weapon nor wielding it in a menacing fashion, he was visibly retreating, and any threat he had posed was gone when the shots were fired. *Id.* at 1133. That the officer had time to warn and did not do so compounded the problem. *Id.* at 1133–34.

Nothing comparable happened here. T.J. was not retreating, and he had not set the gun down. Where the decedent in *Cole* had turned away, T.J.'s final movement brought the gun up. Nor did these officers fire without warning. From the moment they entered, they ordered T.J. to drop the gun, at one point warning that they would shoot him if he did not. [ECF No. 74-2 ¶ 4]. Those commands continued for roughly four minutes. [ECF No. 62-1 ¶¶ 31, 36, 47].

The third decision on which Plaintiff relies is *Craighead v. Lee*, 399 F.3d 954 (8th Cir. 2005). The Court cited it at the pleading stage for the principle that a gun held overhead and pointed upward does not present an immediate threat. [ECF No. 41 at 10–11]. Like *Cole*,

*Craighead* came to the Eighth Circuit on an interlocutory appeal from the denial of summary judgment, so the court took the facts in the plaintiffs' favor. 399 F.3d at 958. An officer responding to a report that a man had fired shots found two men wrestling over a gun. *Id.* at 958–59. On the facts assumed, the man who had just taken the gun held it over his head, pointed upward, throughout the struggle. *Id.* at 961. Within about three seconds of leaving his squad car, and without a warning or command, the officer fired a shotgun from about 30 feet away. He did so when a trained shooter would have known that the gunshot would strike both men, one of whom the officer had to presume was a victim. *Id.* at 960–61. The Eighth Circuit held that use of force objectively unreasonable, and two features of the case drove that holding. The gun was held overhead and pointed upward for the entire struggle. And the officer fired within seconds, without warning, into a struggle in which his shot would strike a man he had to presume was a victim. *Id.* at 960–61.

Neither is present here. A weapon held continuously overhead is not a weapon being raised. And the officers here spent four minutes trying to persuade T.J. to put the gun down before he raised it, and they did not fire into a struggle between two men.

Plaintiff also relies on *Wells ex rel. Locke v. Hanneman*, 144 F.4th 1015 (8th Cir. 2025), for the proposition that officers are not entitled to qualified immunity where video does not blatantly contradict the plaintiff's version of events. [ECF No. 74 at 21 n.6]. *Wells* does not reach that far. Officers executing a no-knock warrant found a man asleep on a couch, and one officer shot him about eight seconds after the team entered. 144 F.4th at 1017. According to the complaint, the man had pointed his gun toward the ground, raised his other hand, and was trying to comply when he was shot. *Id.* The district court denied the officer's motion for judgment on the pleadings, finding the body-worn camera footage too dark and obstructed to contradict those

allegations. *Id.* at 1017–18. The Eighth Circuit agreed that the footage did not blatantly contradict the plaintiff's allegations, dismissed the appeal for lack of jurisdiction, and never decided whether the officer was entitled to qualified immunity. *Id.* at 1018. *Wells* thus involved a weapon lowered in apparent compliance, and it decided only that the appeal could not proceed. Here, the Court has accepted Plaintiff's account of the movement and holds that the force was reasonable on that account.

3. Officers Bollinger and Garcia

Bollinger and Garcia are entitled to summary judgment on a narrower ground. That ground does not depend on the analysis of Duitscher's decision. It rests instead on the reasonableness of the mistake each made in the moment after Duitscher fired.

An act taken on a mistaken perception or belief, if objectively reasonable, does not violate the Fourth Amendment. *Loch*, 689 F.3d at 966 (officer fired on a man he believed was armed who had thrown his gun away moments earlier without the officer seeing it). The Eighth Circuit has applied that rule to officers who fired on a suspect they believed was aiming a weapon at them. *Partlow*, 774 F.3d at 503 (holding that any mistake in perceiving that a suicidal suspect was taking aim "was objectively reasonable in light of the circumstances known to the officers"); *see also Dooley v. Tharp*, 856 F.3d 1177, 1182–83 (8th Cir. 2017) (holding reasonable an officer's perception that a man was swinging a rifle toward him, though the man was in fact trying to free the gun from its sling to comply with a command to drop it).

Both Bollinger and Garcia opened fire only after hearing Duitscher's first shot, believing that T.J. had fired it. [ECF Nos. 62-1 ¶¶ 78–79; 74-2 ¶ 32]. That belief was mistaken, but it was reasonable. A shot was in fact fired in that small room, a few feet from T.J., at the instant he raised the gun. [ECF Nos. 62-1 ¶¶ 29, 76; 74-2 ¶¶ 10, 28]. Their mistake concerned only where the shot

had come from. Bollinger's question to Duitscher moments later, whether he had been hit, reflects what Bollinger perceived. [ECF No. 62-1 ¶ 84]. He testified that T.J.'s statements about jail, dying, and his brother; the way T.J. had been glaring at Duitscher; and the speed with which he brought the gun up led him to believe that T.J. had shot Duitscher. [ECF No. 62-2 at 82]. Garcia testified that he fired both because he saw the gun pointed toward Duitscher and Howard and because he heard the shot. *Id.* at 186–87. What each officer saw of the movement is thus part of why the mistake was reasonable, though the Court need not decide whether the movement alone would have justified their use of force.

Plaintiff argues that the officers' own testimony defeats this conclusion. Because neither officer decided to fire until he heard Duitscher's shot, she reasons, each was either looking at T.J. and saw the gun angled toward T.J.'s own head, or was not looking at all. [ECF No. 74 at 25–26 n.11, 27 n.13]. Either way, she contends, a jury could find the force unjustified. *Id.* Neither alternative carries.

Take the first. What T.J. was actually doing with the gun does not determine what a reasonable officer in that room would have perceived. *Partlow*, 774 F.3d at 502–03. An officer who saw the movement Plaintiff describes, and then heard a gunshot from the direction of a man raising a handgun, could reasonably believe that the shot came from him. Whether the gun was ever aimed at anyone does not control that conclusion. *Maser*, 139 F.4th at 1010. Nor did the officers have time to reason from the position of the gun to the source of the shot; they fired within about a second of hearing it. [ECF No. 74-3 at 47–48].

The second alternative rests on a premise the record does not support. Both officers testified that they were watching T.J. and his weapon in the moments before the shot. [ECF No. 62-2 at 83, 88, 186]. Plaintiff contends that Bollinger's account has shifted since his interview

with state investigators. [ECF No. 74 at 23–24 n.7]. In one respect it has: in the interview, Bollinger did not say that T.J. pointed the gun at anyone, while his later testimony describes the gun as pointed at Duitscher. But the analysis here does not depend on that detail. In both accounts, Bollinger said that he saw T.J. bring the gun up, saw a bang and a flash, and believed T.J. had shot at the officers. [ECF Nos. 62-2 at 84; 68 at 26].

Bollinger and Garcia fired on a reasonable, if mistaken, belief that T.J. had just shot at a fellow officer. Neither Plaintiff's either-or argument nor the change in Bollinger's account undermines that conclusion. Their use of deadly force was objectively reasonable. Bollinger and Garcia did not violate T.J.'s Fourth Amendment rights.

4. The Shots Fired After the First

That the officers were justified in opening fire does not end the inquiry. Plaintiff contends that even if the first shots were reasonable, the officers kept firing after any threat had passed. [ECF No. 74 at 18, 28]. Duitscher fired three rounds, Bollinger three, and Garcia eight, and T.J. dropped the gun before the shooting stopped. [ECF Nos. 62-1 ¶ 81; 74-2 ¶ 29]. The shooting stopped when Duitscher called to hold fire. [ECF No. 62-1 ¶¶ 80, 82]. The question is whether the officers were required to stop sooner.

Officers justified in using deadly force to end a threat need not stop shooting until the threat has ended. *Plumhoff v. Rickard*, 572 U.S. 765, 777 (2014) (upholding 15 shots fired during a 10-second span in which the driver never abandoned his attempt to flee). A court does not divide a single continuous response into individual rounds. *Maser*, 139 F.4th at 1010 (declining to bifurcate the reasonableness of consecutive shots where the shooting was continuous and the officer had no adequate opportunity to reassess whether the threat had passed). Nor does it reconstruct, frame by frame, the timing of individual shots. *See Dooley*, 856 F.3d at 1182–83. Here, the 14 rounds were

fired in a matter of seconds, in a single response to a threat that had not objectively ended, without a break that would have allowed the officers to reassess. [ECF No. 74-3 at 47–48].

Plaintiff relies on *Cole*'s statement that a few seconds is enough time to determine that an immediate threat has passed. 959 F.3d at 1135–36. The interval in *Cole* followed conduct that had visibly ceased. The man had retreated from the door and turned away toward his vehicle, and roughly five seconds passed before the officer fired. *Id*. at 1131, 1133. The principle governs the interval after a threat has ended, not the moments within a single continuous response to a threat still underway. No comparable break occurred here.

Two pieces of evidence bear on whether the shooting should have stopped sooner. Plaintiff's police-practices expert, Thomas Tiderington, opines that at least four rounds were fired after T.J. had been wounded and no longer held the gun. [ECF No. 74-3 at 123, 125]. Plaintiff cites that opinion only in support of her negligence claims. [ECF No. 74 at 33]. The Court nonetheless considers it here. *See* Fed. R. Civ. P. 56(c)(3). And Howard, who did not fire, testified that after the first shot he saw that T.J. was down and concluded there was no need to shoot. [ECF No. 62-2 at 485]. Neither changes the analysis. Officers responding to a handgun raised at close range are not required to pause mid-response to confirm that a wounded suspect has released his weapon. *Maser*, 139 F.4th at 1010. And Howard was not firing. His judgment from his own position does not establish what the officers who were responding to the threat could reasonably perceive. *Graham*, 490 U.S. at 396–97.

Cases holding continued fire unreasonable show what is missing here. In *Roberts v. City of Omaha*, the district court found evidence that an officer fired at a suspect several times, paused, and fired several more times after the suspect had been subdued and no longer posed a threat. 723 F.3d 966, 970, 974 (8th Cir. 2013). Bound by that finding on interlocutory appeal, the Eighth

Circuit held that the officer was not entitled to qualified immunity. *Id.*; *see also Cole*, 959 F.3d at 1132–33 (applying *Roberts* to a shooting that came seconds after the decedent had turned away). The Supreme Court drew the same line in *Plumhoff*, observing that it "would be a different case" if officers had "initiated a second round of shots after an initial round had clearly incapacitated" the suspect, or if he had "clearly given himself up." 572 U.S. at 777. Both describe a threat that has visibly ended, followed by a renewed decision to fire. Neither describes this record, in which every round was part of a single response to T.J.'s raising the gun, and Duitscher ended the shooting within seconds.

5. The Officer Who Did Not Fire

Plaintiff also points to Howard. He stood beside Duitscher with an unobstructed view, did not fire, and never thought that any shot came from T.J. [ECF No. 74-2 ¶¶ 33–34]. Plaintiff argues that his restraint and his testimony support the inference that T.J. was not pointing the gun in a threatening manner. [ECF No. 74 at 22]. Neither creates a genuine dispute of material fact, for two reasons.

First, reasonableness is judged from the perspective of the officer who used the force, on the facts and circumstances confronting him. *Graham*, 490 U.S. at 397. That another officer on the scene perceived the situation differently, or declined to fire, does not establish that the officers who fired acted unreasonably. What matters is what each officer confronted from where he stood. The Eighth Circuit made the point in a related setting. It held that an officer reasonably believed a suspect was armed, even assuming the officer heard bystanders shouting that the suspect was not, because the officer was in no position to verify which was true. *Loch*, 689 F.3d at 966–67.

Howard's own testimony confirms that his decision not to fire did not reflect a different assessment of the threat. He testified that deadly force would have been justified at earlier points

in the encounter, when T.J. brought the gun up toward him and Duitscher, and that he felt everyone's life was in danger. [ECF No. 62-2 at 463–64, 483]. He explained that he held his fire to give Bollinger's conversation with T.J. a chance to work. *Id.* at 464. His restraint was a judgment about tactics, not about whether T.J. was dangerous.

Second, Howard's testimony does not create a dispute about the final movement. Plaintiff relies on two of his statements: that T.J. was careful not to point the gun directly at him, and that whenever T.J. stopped moving his hand, the gun was not pointing at anyone. [ECF No. 74 at 22]. Howard tied both statements to the earlier part of the encounter, when T.J. was gesturing with the gun as he talked. [ECF No. 62-2 at 462–64]. As for the final movement, he testified that the gun was coming up and ended pointing upward, possibly toward T.J.'s own head. *Id.* at 481–83. That testimony adds nothing to the version of the movement the Court has already accepted. Howard also testified that nothing obstructed his view and that he never thought any shot came from T.J. [ECF No. 74-2 ¶¶ 33–34]. But in the moment before the shots, he was watching T.J.'s face, not the gun. [ECF Nos. 62-2 at 475–76; 74-3 at 35]. His testimony therefore says little about what Bollinger and Garcia, who were watching the gun, could reasonably have perceived. If anything, it confirms that each officer's perception depended on where he stood and what he was watching. That supports the conclusion that Bollinger and Garcia made a reasonable mistake; it does not undermine it.

6. Conclusion as to Counts I–III

Duitscher, Bollinger, and Garcia did not violate T.J.'s Fourth Amendment rights. Because the Court so holds as to each officer, it does not reach whether the right Plaintiff asserts was clearly established in December 2022. Summary judgment is granted to Garcia on Count I, to Bollinger

on Count II, and to Duitscher on Count III, to the extent those counts are brought against them in their individual capacities.

*C. Municipal and Official-Capacity Liability (Counts IV–V)*

Counts IV and V allege that the City's and Chief Wingert's inadequate policies and training on deadly force and de-escalation caused T.J.'s death. [ECF No. 30 ¶¶ 87–102]. Chief Wingert is sued only in his official capacity. *Id.* ¶ 7. A claim against a government official in his official capacity is a claim against the entity he serves. *Kentucky v. Graham*, 473 U.S. 159, 165–66 (1985). Count V is therefore a claim against the City. So are Counts I through III, to the extent they name the officers in their official capacities. [ECF No. 30 at 1].

These claims fail for two reasons. First, a municipality cannot be held liable under Section 1983 without an underlying constitutional violation by one of its officers. *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (per curiam); *Partridge III*, 157 F.4th at 973–74 (affirming judgment for the municipal defendants after the jury found for the officer). The Court has held that none of the officers violated T.J.'s Fourth Amendment rights. Second, Plaintiff's resistance does not respond to Defendants' arguments on these claims. [ECF No. 74 at 1–2]. A party that fails to oppose a basis for summary judgment waives the argument. *Paskert v. Kemna-ASA Auto Plaza, Inc.*, 950 F.3d 535, 540 (8th Cir. 2020). Plaintiff has abandoned these claims.

Summary judgment is granted to the City on Count IV and to Chief Wingert on Count V. Summary judgment is also granted to Duitscher, Bollinger, and Garcia on Counts I through III to the extent those counts are brought against them in their official capacities.

*D. The Iowa-Law Claims (Counts VI–X)*

Counts VI through X arise under Iowa law. Counts VI through VIII allege that each officer breached a duty "to exercise a reasonable degree of care and skill in the use of a reasonable degree

of force." [ECF No. 30 ¶¶ 105, 112, 119]. Count IX alleges that Chief Wingert was negligent in training and supervising the officers. *Id.* ¶ 126. Count X seeks to hold the City and Chief Wingert liable for the officers' conduct under the doctrine of *respondeat superior*. *Id.* ¶¶ 131–34. The parties are not diverse. *Id.* ¶¶ 5–11. The Court's jurisdiction over these claims is therefore supplemental. 28 U.S.C. § 1367(a).

A district court may decline to exercise supplemental jurisdiction over a claim that raises a novel or complex issue of state law, or where it has dismissed all claims over which it has original jurisdiction. 28 U.S.C. § 1367(c)(1), (3). In the usual case in which all federal claims are eliminated before trial, the relevant factors—judicial economy, convenience, fairness, and comity—point toward declining jurisdiction over the remaining state-law claims. *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988).

Both provisions apply here, and nothing sets this case apart from the ordinary one *Cohill* describes. With the federal claims resolved, no claim within the Court's original jurisdiction remains. And the state-law claims turn on questions of Iowa law that the Fourth Amendment analysis does not answer. Where Iowa-law claims challenge the same use of force as a plaintiff's Fourth Amendment claims, the federal holding may resolve them as well. *See Dooley*, 856 F.3d at 1184 (affirming summary judgment on Iowa-law claims of assault, battery, and negligence after holding the force objectively reasonable). Plaintiff's negligence theory reaches further.

Plaintiff does not argue that the shooting itself was negligent. She contends the officers were negligent in the tactical choices that preceded it: entering the apartment, positioning themselves within a few feet of an armed teenager in crisis, keeping their lights on him, and failing to disengage. [ECF No. 74 at 32–33]. For the proposition that an officer's duty of care extends to conduct preceding a shooting, she relies on decisions applying California law. *Id.* at 31–32.

Defendants respond that Iowa measures an officer's use of force by a reasonableness standard that tracks the Fourth Amendment's, that Plaintiff never pleaded the tactical theory, and that she has shown no damages attributable to it. [ECF No. 77 at 4–5].

Whether Iowa recognizes the duty Plaintiff asserts, and how it would apply here, are questions for Iowa courts. Federal courts should avoid rendering needless decisions of state law, both as a matter of comity and to give the parties a more authoritative reading of state law. *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966).

Declining jurisdiction works no unfairness on the parties. Plaintiff has asserted these claims from the outset of this case, in her original complaint and again in her amended complaint. [ECF Nos. 1 ¶¶ 93–124; 30 ¶¶ 103–34]. The limitations period for them has been suspended while they have been pending here and will remain suspended for 30 days after their dismissal, unless Iowa law provides a longer tolling period. 28 U.S.C. § 1367(d); *Artis v. District of Columbia*, 583 U.S. 71, 74–75 (2018) (holding timely a claim refiled in state court 59 days after the federal court dismissed it). That rule applies to claims against political subdivisions such as the City. *Jinks v. Richland County*, 538 U.S. 456, 465–67 (2003) (applying Section 1367(d) to wrongful-death claims against a county after the federal court declined supplemental jurisdiction). The record the parties developed in discovery remains available to them in state court.

Each of the relevant considerations points the same way. No federal claim remains, the state-law claims turn on unsettled questions of Iowa law, and Plaintiff may pursue them in state court with the benefit of Section 1367(d). The Court therefore declines to exercise supplemental jurisdiction over Counts VI through X and dismisses them without prejudice.

## IV. CONCLUSION

When the Court denied the motion to dismiss, it observed that discovery might reveal facts that would alter its analysis. Such is the case here. The Fourth Amendment asks whether an officer's use of force was reasonable in light of what he confronted when he used it. On the full record, viewed in Plaintiff's favor, each officer's decision met that standard. That conclusion is a narrow one. It does not lessen the loss of a young man's life. Nor does it decide whether the officers' tactical choices were negligent under Iowa law; that question belongs to the Iowa courts. It holds only that the officers did not violate the Constitution.

For these reasons, Defendants' Motion to File Summary Judgment Documents Under Seal is DENIED. [ECF No. 57]. Unsealing is held in abeyance pending completion of the procedure set out in Part II.B.4. Defendants' Motion for Summary Judgment is GRANTED as to Counts I through V. [ECF No. 62]. The Court declines to exercise supplemental jurisdiction over Counts VI through X, which are DISMISSED without prejudice, and the motion is DENIED AS MOOT as to those counts. The Clerk of Court shall enter judgment upon entry of the order unsealing the record.

IT IS SO ORDERED.

Dated this 30th day of September, 2026.

STEPHANIE M. ROSE, CHIEF JUDGE
UNITED STATES DISTRICT COURT